[Civ. No. 42014. First Dist., Div. One. May 1, 1978.]

DEBORAH NAZAROFF, Petitioner, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY,
Respondent;
ROBERT BECKER et al., Real Parties in Interest.

554

COUNSEL

Rodney R. Atchison and Robert F. Howell for Petitioner.

No appearance for Respondent.

Grunsky, Pybrum, Skemp & Ebey, Warren E. Eraut and Frederick H. Ebey for Real Parties in Interest.

OPINION

SIMS, J.*—By her petition for writ of mandate, petitioner, the mother of a three-year-old infant who died from the effects of near drowning in a swimming pool owned and controlled by real parties in interest, seeks to set aside an order of the trial court that granted the pool owners' motion for partial summary judgment on a cause of action in which she sought recovery for her physical injuries resulting from her emotional distress at witnessing her son being pulled from the swimming pool, and in participating in unavailing attempts to fully revive him.[1] On review it is determined that triable issues of fact exist as to whether plaintiff is entitled to recover damages for physical injuries resulting from shock and emotional distress. The petition must be granted, and a peremptory writ of mandate will issue as prayed.

■ Since the mother's cause of action for wrongful death persists, there is no final judgment from which an appeal will lie. (See *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 806 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; *Field Research Corp.* v. *Superior Court* (1969) 71 Cal.2d 110, 111 [77 Cal.Rptr. 243, 453 P.2d 747]; and *Mather* v. *Mather* (1936) 5 Cal.2d 617, 618 [55 P.2d 1174]. Cf. *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122]; *Arauz* v. *Gerhardt* (1977) 68 Cal.App.3d 937, 940-941 [137 Cal.Rptr. 619]; and *Archibald* v. *Braverman* (1969) 275 Cal.App.2d 253, 254 [79 Cal.Rptr. 723].) Nevertheless, where

---

*Assigned by the Chairperson of the Judicial Council.

[1]Plaintiff's complaint consists of three causes of action: wrongful death, emotional distress and loss of consortium. The court also ordered summary judgment, on plaintiff's concession, on the third cause of action for loss of consortium. (See *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461, 466, and fn. 3 [138 Cal.Rptr. 315, 563 P.2d 871], disapproving contrary views in *Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573, 586 [127 Cal.Rptr. 720]; and *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538, 545-547 [119 Cal.Rptr. 639], in which cases the Court of Appeal also dealt with damages for emotional distress, see text below.)

an order bars a substantial portion of a plaintiff's case from being heard on the merits, a petition for writ of mandate to vacate that order may be maintained. (*Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800, 807; *Field Research Corp.* v. *Superior Court, supra,* 71 Cal.2d 110, 111.)[2]

■ The rules governing summary judgments are collated in *Stationers Corp.* v. *Dun & Bradstreet, Inc.* (1965) 62 Cal.2d 412 [42 Cal.Rptr. 449, 398 P.2d 785]. There the court concluded, "Thus, the trial court was justified in granting the motion here only if the declarations filed in support of it, strictly construed, contain facts sufficient to entitle the defendants to judgment, and those of the plaintiffs, liberally construed, show that there was no issue of fact to be tried." (62 Cal.2d at p. 417. See also *Vesely* v. *Sager* (1971) 5 Cal.3d 153, 169 [95 Cal.Rptr. 623, 486 P.2d 151]; *Pettis* v. *General Tel. Co.* (1967) 66 Cal.2d 503, 505 [58 Cal.Rptr. 316, 426 P.2d 884]; *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127-128 [109 Cal.Rptr. 724]; *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253, *passim*; and *Thornton* v. *Victor Meat Co.* (1968) 260 Cal.App.2d 452, 457-458 [67 Cal.Rptr. 887]. Cf. *Loma Portal Civic Club* v. *American Airlines, Inc.* (1964) 61 Cal.2d 582, 588 [39 Cal.Rptr. 708, 394 P.2d 548]; *Arauz* v. *Gerhardt, supra,* 68 Cal.App.3d 937, 940-941; and *Swaffield* v. *Universal Ecsco Co.* (1969) 271 Cal.App.2d 147, 171-172 [76 Cal.Rptr. 680].)

■ In support of the allegations of the second cause of action in her complaint[3] petitioner filed the following declaration, "On July 8, 1976, I

---

[2]Although this court originally summarily denied the petition, the Supreme Court granted petitioner's petition for hearing and ordered the issuance of an alternative writ of mandamus. The absence of another adequate remedy was determined by that court when it ordered the issuance of an alternative writ. (See *Babb* v. *Superior Court* (1971) 3 Cal.3d 841, 851 [92 Cal.Rptr. 179, 479 P.2d 379]; and 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 94, pp. 3869-3870.)

[3]Petitioner alleged:

"II. At all times herein mentioned, on July 8, 1976, at or about 7:00 p.m., plaintiff had been searching for her son, DANNY, who had been out of her sight for a short period of time. While plaintiff was inquiring as to DANNY's whereabouts, she was advised that he was found floating in defendants' swimming pool. Plaintiff immediately went to the site of the swimming pool, a short distance away, and observed her son being pulled from the swimming pool. Another person started mouth to mouth resuscitation on her son, but plaintiff immediately took over the life saving efforts, providing mouth to mouth resuscitation, heart thumping and other measures in an effort to revive her son, who was unconscious and turning blue.

"III. Plaintiff's son was hospitalized from July 8th until July 11th, 1976, at which time he died. Throughout the time that her son was in the hospital, plaintiff slept, ate and lived at the hospital, keeping her son under observation.

"IV. Because of the negligence and carelessness of the defendants, and each of them, and as a proximate result thereof, and particularly as a result of defendants' violation of

had been searching for my son Daniel R. Nazaroff, who had been missing for a short period of time. I had just walked by the home of Robert and Sylva Becker, and was standing in front of the property adjacent to the Becker's home speaking with a neighbor about Danny's whereabouts. Suddenly I heard a scream from Robyn Becker from her yard. She screamed just the words 'It's Danny.' I immediately had the dreadful knowledge that Danny had somehow gotten into the Beckers swimming pool and that he was hurt. I was perhaps thirty feet away from the entrance to the Becker's yard and pool when I heard the scream. I immediately ran toward the pool, and as I was running I saw a person I believed to be Nancy Akers pulling Danny from the pool. Danny was still partly in and partly out of the pool. [¶] By the time I arrived at the pool edge, Nancy Akers had commenced mouth-to-mouth resuscitation. I immediately pushed her aside and commenced mouth-to-mouth resuscitation and heart thumping. . . ."

She also filed the declaration of the physician who attended her son for the three days preceding his death. It states in part: "Daniel R. Nazaroff suffered and died from the effects of near drowning, including severe hypoxia and broncho-pneumonia. [¶] The etiology of hypoxia, developing as a result of fresh water near drowning, is such that each moment that the victim suffers a deprivation of oxygen contributes significantly to the hypoxia and ultimate brain damage or death. [¶] In near drowning situations, the trauma consists of a continuing insult to the body, rather than a single event. In near drowning situations, when death is the result of hypoxia, the trauma continues until such time as adequate oxygenation has taken place to restore arterial blood gas and acid base levels."

The moving party relied upon extracts from the plaintiff's deposition which indicate that she missed her son and was searching for him in the neighborhood when she heard a cry and she ran and saw him as he was pulled up. She testified that the pool owner's daughter told her the boy

---

the County Ordinance hereinabove quoted, plaintiff sustained great emotional disturbance and shock and physical injury to her nervous system, all of which has caused, continues to cause and will cause her great physical and mental pain and suffering, all to her damage in an amount to be established at trial.

"V. Plaintiff was reasonably required to and did incur medical and incidental expenses for the examination, treatment and care of the aforesaid injuries, the exact amount of which is unknown at this time. Plaintiff is informed and believes, and therefore alleges, that she will in the future be required to incur additional medical and incidental expenses.

"VI. Plaintiff has sustained an injury to and impairment of her future earning capacity, and the ability to engage in gainful occupation and has thereby suffered further damages, the exact amount of which is unknown at this time."

was in the pool; but she apparently observed him because she further testified she reached him when he was just being put on the side of the pool. She also testified concerning her efforts to treat him with artificial resuscitation and heart massage. The defendants also filed declarations by the pool owner's wife, who was not a percipient witness of the rescue, by her daughter, and by a woman who participated with the daughter in pulling the boy from the pool. It appears that the latter came to pick up the Becker girl for a babysitting assignment, she observed something in the pool, and directed the girl's attention to it. It proved to be the Nazaroff boy. The Becker girl pulled the boy out of the pool and her companion began mouth-to-mouth resuscitation. According to them, the mother did not arrive until after the resuscitation attempt had begun, and according to the woman administering it, her arrival was three or four minutes later.

In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], the majority opinion authored by Justice Tobriner opens with the following statement: "That the courts should allow recovery to a mother who suffers emotional trauma and physical injury from witnessing the infliction of death or injury to her child for which the tortfeasor is liable in negligence would appear to be a compelling proposition." (68 Cal.2d at p. 730.) It states and refutes the arguments advanced in past American decisions which have barred the mother's recovery. It first points out, "This court in the past has rejected the argument that we must deny recovery upon a legitimate claim because other fraudulent ones may be urged." (*Id.,* p. 735; see pp. 735-739.) The opinion then approaches the argument that to permit such recovery "would involve the courts in the hopeless task of defining the extent of the tortfeasor's liability," and it concludes: "The alleged inability to fix definitions for recovery on the different facts of future cases does not justify the denial of recovery on the specific facts of the instant case; in any event, proper guidelines can indicate the extent of liability for such future cases." (*Id.,* pp. 730, 739.)

The first statement under the foregoing postulates, reads, "In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable." (*Id.,* p. 739.) If the opinion had stopped at that point, there would be no reason not to foresee that any parent who not only observed, but who only subsequently learned of an injury to an offspring, might suffer shock severe enough to cause substantial injury. (See Burke, J., dis., as

quoted below.) The opinion, however, recognizing that "no immutable rule can establish the extent of that obligation for every circumstance of the future," prescribed guidelines for the resolution of such an issue. The court first prescribed that the right to recover was limited to shock which results in physical injury. (*Id.,* p. 740.)[4] It then stated, "In determining, in such a case, whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Id.,* pp. 740-741.)

We are here concerned with the first and second factors. The opinion states: "The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction"; and "Surely the negligent driver who causes the death of a young child may reasonably expect that the mother will not be far distant and will upon witnessing the accident suffer emotional trauma. As Dean Prosser has stated: 'when a child is endangered, it is not beyond contemplation that its mother will be somewhere in the vicinity, and will suffer serious shock.' (Prosser, The Law of Torts, *supra,* at p. 353. See also 2 Harper & James, The Law of Torts, *supra,* at p. 1039.)" (*Id.,* p. 741.)

[4]See also *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 74-76 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Capelouto* v. *Kaiser Foundation Hospitals* (1977) 7 Cal.3d 889, 892, fn. 1 [103 Cal.Rptr. 856, 500 P.2d 880]; *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538, 542-543 [119 Cal.Rptr. 639]; and *Employers Cas. Ins. Co.* v. *Foust* (1972) 29 Cal.App.3d 382, 386-388 [105 Cal.Rptr. 505]. The shock and emotional distress giving rise to the physical injury must be caused "by the direct emotional impact of [the viewer's or auditor's] sensory and contemporaneous observance of the accident." (*Krouse* v. *Graham, supra,* 19 Cal.3d 59, 77-78.)

Plaintiff's complaint contains allegations set forth above (fn. 3, pars. IV, V and VI). The record shows that after the death of her son the plaintiff was under the care of a psychiatrist and taking medication for shock and depression, which had resulted in her drinking heavily and wanting to commit suicide. Her gynecologist hospitalized her for two weeks in connection with abdominal pain attendant to her pregnancy because of something to do with her blood, which had never been a problem before the death of her son. We assume, as have the parties and the trial court, that there were triable issues of fact as to whether plaintiff suffered physical injury, and with respect to the proximate cause of any such injury.

The problems of application of the guidelines were pointed out by Justice Burke in his dissent, as follows: "Next, how 'near' must the plaintiff have been to the scene of the accident, and how 'soon' must shock have been felt? Indeed, what is the magic in the plaintiff's being actually present? Is the shock any less real if the mother does not know of the accident until her injured child is brought into her home? On the other hand, is it any less real if the mother is physically present at the scene but is nevertheless unaware of the danger or injury to her child until after the accident has occurred? No answers to these questions are to be found in today's majority opinion. Our trial courts, however, will not so easily escape the burden of distinguishing between litigants on the basis of such artificial and unpredictable distinctions." (68 Cal.2d at pp. 749-750.)

This case presents us with the burden foreseen by Justice Burke. We are assisted, however, by precedents which have been promulgated in the intervening period. Before examining the developing law we turn once more to the opinion in *Dillon* v. *Legg, supra,* to observe that the court was not creating parameters but merely guidelines. The court stated: "Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis. We cannot now predetermine defendant's obligation in every situation by a fixed category; no immutable rule can establish the extent of that obligation for every circumstance of the future." (*Id.,* p. 740.) After pronouncing the guidelines quoted above, the decision added, "All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case. [¶] In light of these factors the court will determine whether the accident and harm was *reasonably* foreseeable. Such reasonable foreseeability does not turn on whether the particular plaintiff as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts, on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The courts thus mark out the areas of liability, excluding the remote and unexpected." (*Id.,* p. 741.) Finally, we read, "We are not now called upon to decide whether, in the absence or reduced weight of some of the above factors, we would conclude that the accident and injury were not reasonably foreseeable and that therefore defendant owed no duty of due care to plaintiff. In future cases the courts will draw lines of demarcation upon facts more subtle than the compelling ones alleged in the complaint before us." (*Id.*)

█ Eight prior cases[5] applying the guidelines of *Dillon* v. *Legg* have been reviewed in our Supreme Court's last analysis of the question. (See *Justus* v. *Atchison, supra,* 19 Cal.3d 564, 582-584. See also, *Arauz* v. *Gerhardt, supra,* 68 Cal.App.3d 937, 944-949.) In *Justus* the court upheld judgments entered after demurrers had been sustained without leave to amend to a cause of action for the shock the plaintiff father allegedly experienced in witnessing the stillbirth of a fetus occurring in the course of delivery. The court analyzed the facts alleged as follows: "In short, the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact. As we have seen, however, a shock caused by 'learning of the accident from others after its occurrence' (68 Cal.2d at p. 741) will not support a cause of action under *Dillon.* (See, e.g., *Arauz* v. *Gerhardt* (1977) *supra,* 68 Cal.App.3d 937, 949.)" (19 Cal.3d at p. 585.) The reference was obviously to the plaintiff's lack of sensory and contemporaneous observance of the accident. There was no emotional impact and shock until the consequences of the events unfolding before the observer, but then not fully comprehended, were subsequently explained. As the court pointed out, the father could neither see the injury to the victim nor sense it. (*Id.,* pp. 584-585.) In this case the trial court in its memorandum decision applied the principle quoted above strictly, and granted the motion for summary judgment.

█ The evidence, construed most favorably to the mother in this case, reflected that her first sensory perception that her child had fallen into the pool came when she heard the cry of the rescuers who observed the child's plight. She arrived after the accident had occurred and when the child was being removed to a place of safety. The principle expostulated and applied by the trial court is clearly established by the intervening decisions. (See *Deboe* v. *Horn* (1971) 16 Cal.App.3d 221, 223-224 [94 Cal.Rptr. 77]; *Jansen* v. *Childrens Hospital Medical Center* (1973) 31 Cal.App.3d 22, 23-25 [106 Cal.Rptr. 883]; *Powers* v. *Sissoev* (1974) 39 Cal.App.3d 865, 870-874 [114 Cal.Rptr. 868]; *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538, 542-544 [119 Cal.Rptr. 639]; and *Arauz* v. *Gerhardt, supra,* 68 Cal.App.3d 937, 943-949.)

---

[5]Other cases have tangentially touched on the subject, but they add nothing to our discussion here. (See *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892, fn. 1 [103 Cal.Rptr. 856, 500 P.2d 880]; *United Services Automobile Assn.* v. *Warner* (1976) 64 Cal.App.3d 957, 964 [135 Cal.Rptr. 34]; *Park* v. *Standard Chem Way Co.* (1976) 60 Cal.App.3d 47, 50 [131 Cal.Rptr. 338]; *Vanguard Ins. Co.* v. *Schabatka* (1975) 46 Cal.App.3d 887, 895-899 [120 Cal.Rptr. 614]; *Employers Cas. Ins. Co.* v. *Foust* (1972) 29 Cal.App.3d 382, 386-388 [105 Cal.Rptr. 505]; *Saxton* v. *McDonnell Douglas Aircraft Co.* (C.D.Cal. 1977) 428 F.Supp. 1047, 1050-1052; and 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 549-553, pp. 2816-2820.)

On the other hand, the courts have not hesitated to recognize a right to recover under appropriate circumstances. In *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253, the plaintiff's 13-year-old son sustained serious personal injuries as the result of an explosion of gunpowder allegedly occasioned by the defendants' negligence. Within moments of the actual explosion, the mother appeared at the scene in an effort to render aid to her son. Upon observing her son's injuries, she suffered severe fright, shock, and mental illness requiring institutionalization. The court reversed a summary judgment for the defendants. It analyzed the situation as follows: "The issue then arises whether the 'observance' factor requires that the plaintiff witness the tortious act. A plaintiff claiming damages for emotional trauma as a result of injury to a third party must either be present at the time of the accident (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 740-741) or the shock sustained by the plaintiff must be fairly contemporaneous with the accident rather than follow when the plaintiff is informed of the whole matter at a later date. (Prosser, Law of Torts (3d ed. 1964) p. 354.) Manifestly, the shock of seeing a child severely injured immediately after the tortious event may be just as profound as that experienced in witnessing the accident itself. Consequently, the shock sustained by the mother herein was 'contemporaneous' with the explosion so as to satisfy the 'observance' factor." (275 Cal.App.2d at p. 256.)

In *Mobaldi* v. *Regents of University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720], the court reversed a judgment entered following the sustaining of a demurrer to plaintiffs' complaint and remanded the case with leave to plaintiffs to amend. The court ruled, "We conclude . . . that where . . . the plaintiff perceives by sight and hearing the physical injury to another in her presence caused by the defendant's negligence, the guideline requirement of direct emotional impact from sensory and contemporaneous observation of the accident is satisfied, although the plaintiff may not be aware of the precise nature of the negligence." (55 Cal.App.3d at p. 577.) There the foster mother witnessed the injuries to the infant held in her arms as he became spastic and convulsant and finally comatose from the administration of an overly concentrated mixture of glucose.

Finally, in *Krouse* v. *Graham* (1977) 19 Cal.3d 59 [137 Cal.Rptr. 863, 562 P.2d 1022], where the husband sought recovery for the emotional trauma incident to his witnessing his wife's death, the court approved *Archibald* v. *Braverman, supra,* as follows: "We confirm the propriety of the expression in *Archibald, supra,* that the *Dillon* requirement of 'sensory

and contemporaneous observance of the accident' does not require a *visual* perception of the impact causing the death or injury. In the matter before us, although Benjamin did not see Elizabeth struck by defendant's automobile, he fully perceived the fact that she had been so struck, for he knew her position an instant before the impact, observed defendant's vehicle approach her at a high speed on a collision course, and realized that defendant's car must have struck her. Clearly, under such circumstances Benjamin must be deemed a percipient witness to the impact causing Elizabeth's catastrophic injuries." (19 Cal.3d at p. 76.)[6]

■ Here, unlike *Krouse* and *Mobaldi,* the plaintiff was not in a position to directly observe the initial impact of the defendants' negligence upon the related victim. The attempts to revive the child, and the observation of the degenerating physical condition of the child tend to fall within the subsequent sensory perceptions found to be too remote in the *Jansen* and *Arauz* cases. In the former case the court rejected the view that visibility of the result of an alleged negligent diagnosis of the child's illness, as distinguished from observance of the tortious act, would supply the essential element. (31 Cal.App.3d at p. 24.)

■ In the latter case the court upheld a summary judgment for the defendants where the mother admittedly arrived shortly after her son was injured when struck by a car from which he had just alighted. In reviewing the same cases as were subsequently the subject of analysis by the Supreme Court in *Justus,* the court adopted the explanation of the *Archibald* case found in *Jansen.* It stated: "In reviewing these appellate cases it becomes clear that where the plaintiff has been allowed recovery, or has been said to have stated a cause of action, for injuries alleged to have been caused by emotional distress suffered as a result of negligent infliction of physical injury to a third person, the plaintiff has been actually present at the scene at the time of the tortious act in every case except *Archibald* v. *Braverman, supra,* 275 Cal.App.2d 253. In the case presently before this court, it is true that plaintiff Arauz arrived at the scene of the accident shortly after it occurred. When precisely she arrived

---

[6]The court also approved the following instruction, now found in BAJI (6th ed. 1977) No. 12.83: "Ordinarily the law does not permit recovery of damages for physical harm and emotional distress caused by the knowledge of an injury to or death of another person. [¶] However, if a plaintiff has suffered an emotional shock resulting in physical harm which was proximately caused by the direct emotional impact from the contemporaneous observation of the immediate consequences of a negligent act which was the proximate cause of injury or death to another person in a relationship such as plaintiff bore to _____, then such a plaintiff is entitled to recover damages for such physical harm, together with damages for emotional distress, if any." It also approved No. 12.84 (19 Cal.2d at p. 77).

is a disputed fact. What she saw when she arrived is also disputed. [¶] In commenting on *Archibald* v. *Braverman,* the court in *Jansen* v. *Children's Hospital Medical Center, supra,* 31 Cal.App.3d 22, at page 24, noted that it could be inferred that the mother in *Archibald* heard the explosion. The court further stated: 'In any event, it is clear that even a lay person, viewing the gory result, necessarily reconstructed mentally the precise brief event itself, and in *Archibald,* did so substantially contemporaneously with that event.' " (68 Cal.App.3d at pp. 947-948.) That analysis is buttressed by *Krouse,* where the reference quoted above, by its emphasis on *"visual,"* suggests that there was an auditory perception in *Archibald.*

Unless we accept that distinction, it is difficult to understand why Mrs. Arauz, who allegedly saw blood all over her son's face and head and his jacket and part of his shoes, could not reconstruct the event as well as Mrs. Archibald was deemed to have done in her case. Nor can we say what the decision might be if the mother arrived at the scene to find her son under the vehicle which had struck him. The analysis of the cases in *Justus* does not resolve the dilemma. *Archibald* is described as follows: ". . . 'within moments' after a child was seriously injured in an explosion his mother appeared on the scene and saw his bleeding and maimed body. The court held that the shock she suffered was essentially contemporaneous with the accident itself." (19 Cal.3d at p. 582.) *Arauz* is classified as an application of the rule that there is no recovery for shock not contemporaneous with the accident, or for shock from circumstances undergone by every parent whose child has been injured in an nonobserved and antecedent accident, or for shock from knowledge of an unobserved tort, particularly in the absence of any sensory perception of the impact. (*Id.,* at pp. 583-584.) It is also referred to as a case where the shocked relative learns of the accident from others after its occurrence.

On balance, and in the light of all of the criteria reviewed above, we must conclude that the record before the court demonstrates that there are triable issues of fact to carry to the jury as to whether the alleged physical harm to the mother resulted from an emotional shock proximately caused by the direct emotional impact from the contemporaneous observation of the immediate consequences of the defendants' negligent act, which was the proximate cause of the injury and death of her son. (See BAJI No. 12.83, fn. 5 above.) The shout from the pool area may have permitted her to reconstruct the scene, as well as did Mrs. Archibald and Mr. Krouse. Her knowledge of what had occurred was derived from her own senses, and not from another's recital of an uncontemporaneous event. Drowning, or near drowning, though initiated

by an immersion, is not an instantaneous occurrence. We cannot say as a matter of law that the injuries resulting from defendants' negligence were not still being experienced at the time the mother first observed her son. █ The evidence is conflicting as to the time of and the circumstances existing at her arrival. She must, of course, establish that she suffered physical injury, and that the physical injury resulted from an emotional shock suffered at the original discovery of her son's plight, contemporaneously with the receipt of his injury, and not from the subsequent realization of the irreversible progress of that injury and her ensuing grief and sorrow on his death.

█ Finally, we note an apparent paradox in the application of *Dillon* v. *Legg* to the facts of an accident such as occurred here. A swimming pool or other "attractive nuisance" is dangerous because of the inability of an unattended infant to appreciate the inherent danger. On the other hand, *Dillon* v. *Legg* requires "the sensory and contemporaneous observance of the accident." It may be argued that the two concepts are mutually exclusive, because if the shocked mother is present, she should have avoided the accident the duty of care on the landowner is designed to avoid. It will, of course, be the rare case, such as this, or *Archibald,* where the relative of the injured party senses the accident sufficiently contemporaneously with its occurrence, but too late to prevent the injury. We do not deem that consideration one that should lead to denial of liability, but, as stated in *Archibald,* such a "rare occurrence" as to rebut the claim "that allowing recovery here would open the gates to a volume of claims impossible for the courts to handle."

The petition is granted. Let a peremptory writ of mandate issue commanding respondent court to set aside and vacate its order granting summary judgment as to the second cause of action in plaintiff's complaint and to enter an order denying the motion as to said cause of action.

Racanelli, P. J., and Elkington, J., concurred.

The petition of the real parties in interest for a hearing by the Supreme Court was denied June 28, 1978.