[Civ. No. 22218. Third Dist. Dec. 12, 1984.]

RYAN J. ANDALON, a Minor, etc., et al., Petitioners, v.
THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, Respondent;
WARREN PLOWMAN, Real Party in Interest.

**[Opinion certified for partial publication.*]**

---

*See footnote 2, *post*.

### COUNSEL

Friedman, Collard, Poswall & Thompson, Friedman, Collard, Poswall & Virga and Allan J. Owen for Petitioners.

No appearance for Respondent.

Diehl, Steinheimer, Riggio, Haydel & Mordaunt, Diehl, Steinheimer, Riggio, Haydel, Mordaunt & Smith and Joseph H. Fagundes for Real Party in Interest.

### OPINION

**BLEASE, J.**—Petitioners, Ryan (the child), Ruth (the mother), and Adolph (the father), brought suit against real party in interest (the defendant) alleging that his medical malpractice, in providing prenatal care to Ruth, resulted

in the unwanted birth of Ryan, who is afflicted with Down's Syndrome.[1] The defendant sought to resolve, by partial summary judgment (now, called a summary adjudication of issues), the legal measure of damages: to establish that the child may not recover for lost earning capacity: that neither the child nor the parents may recover general damages: that the parents may not recover damages for emotional distress: and, in the alternative, that general damages must be limited to $250,000 by reason of Civil Code section 3333.2. The trial court granted the motion. Thereafter, petitioners sought to amend the complaint to "clarify" their contention that it presented a claim for recovery for bodily injury to the mother resulting from negligent medical treatment before, during, and after childbirth. The trial court denied leave to amend on the ground of the statute of limitations.

Petitions for writs of mandate were filed with this court contesting both rulings. Because the rulings bar a substantial portion of plaintiffs' case from being heard on the merits we issued alternative writs and consolidated the proceedings to review the unsettled questions of law. (See *Nazaroff* v. *Superior Court* (1978) 80 Cal.App.3d 553, 557-558 [145 Cal.Rptr. 657].) We will grant a peremptory writ directing the trial court to vacate its order granting defendant's motion for partial summary judgment.[2]

I

At the outset we consider the propriety of a summary judgment proceeding for resolution of the issues tendered. As we shall explain, the issues are not suited to a summary adjudication under Code of Civil Procedure section 437c although we do reach and resolve them on other grounds.

The law and facts of a case bear a chicken and egg relationship. ██ ██ ██ The law identifies the *kinds* of facts which are material[3] to the case.

---

[1] Down's Syndrome occurs as a result of a chromosonal abnormality. It is generally associated with its distinctive physical stigmata and often accompanied by associated physical complications. (2 Schmidt's, Attorney's Dictionary of Medicine (1984) p. M-129.) The chief impairment caused by the disorder is mental retardation. It has been estimated that the condition now represents over one-third of the severely to moderately retarded population in the United States. (Gibson, Down's Syndrome (1978) p. 1) "The prevalence of the disorder continues to mount because medical science can better ensure the survival of the high-risk [Down's Syndrome] infant. It is also a time when average maternal age is allegedly increasing and preventive measures are still not being widely applied." (*Ibid.*) The distribution of IQ for Down's syndrome centers in the trainable mentally retarded range with a small minority rising to the level of educable mentally retarded. (*Id.,* at p. 41.)

[2] The Reporter of Decisions is directed not to publish part IV of this opinion.

[3] "[M]ateriality depends on the *issues in the case*; evidence which does not relate to a matter in issue is *immaterial.* [citations] [¶] What matters are in issue (and consequently material) is determined mainly by the pleadings, the rules of pleading, and the substantive law relating to the particular kind of case." (Witkin, Cal. Evidence (2d ed. 1966) § 301, p. 265; italics in original.)

The facts delimit the applicable propositions of law. (See generally, Hart & Sacks, The Legal Process, Basic Problems in the Making and Application of Law (Cambridge tent.ed. 1958) (unpub. manuscript in Harvard Law School library) p. 383.) Properly drafted pleadings display this recursive relationship. ■ The purpose of a summary judgment proceeding is to permit a party to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.

If such (material) facts are dispositive of one or all of the legal claims tendered by the pleadings, the prevailing party is entitled, respectively, to a partial or complete summary judgment. If they are dispositive of something less than one of the claims, e.g., an element of a cause of action or an element of a defense, the prevailing party is entitled to a declaration that there is no triable controversy concerning that component of the cause or defense, i.e., a summary adjudication of that issue. Issues of law are thus adjudicated in the course of the determination whether the undisputed material facts are dispositive with respect to a claim, cause, defense, or one of their components. A summary judgment proceeding is not appropriate for the adjudication of abstract, factually disembodied, propositions of law; it is not an omnibus procedure which replaces all other law and motion procedures.

■ In the summary judgment proceedings below there was but one undisputed fact which was tendered: that neither plaintiff-parent learned of the child's Down's syndrome by perceiving it during the event of birth. This limited factual predicate circumscribes the issues available for summary adjudication. Defendant sought to resolve, as questions of law, issues concerning damages to parents and child. The fact he demonstrated has no bearing on any component of the cause of action of the child for wrongful life or the defenses thereto. Accordingly, his requests for adjudication of conclusions of law concerning the child's damages are palpably out of place in the summary judgment proceedings.

The disputed issues of law concerning the parents' damages present more complex problems. Whether they are appropriate for resolution in summary judgment proceedings depends upon the legal theory embedded in the cause of action for wrongful birth. This implicates the perplexing cause of action for negligent infliction of emotional distress, which we will discuss at length. As we will show, the solitary undisputed fact does not establish a defense or an element of a defense to the parents' causes of action predicated on that theory. Accordingly, the legal propositions advanced by defendant are not amenable to summary adjudication.

Perhaps this conclusion is anticlimatic, for we will nonetheless reach and resolve the damage issues because they have been fully briefed, arise nat-

urally in the course of demonstrating the inappropriateness of summary judgment, and are important for the guidance of the trial court and the litigants.

## II

Defendant did tie his factual showing to a claimed defense to the parents' cause of action. The claim is premised on the theory that the parents can recover for mental distress only if it is engendered by a shock received at the time of the birth of the child. To be actionable, he presupposes the shock must derive from the contemporaneous perception of the birth and the genetic defect, an issue which can be resolved upon the sole undisputed fact. Defendant's characterization of the parental cause of action derives from a line of case law commencing with *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. An analysis of this case law is the path which leads to the conclusion we reach.

*Dillon*'s roots are to be found in the soil so prominently tilled by *Palsgraf* [*Palsgraf* v. *Long Island R. Co.* (1928) 248 N.Y. 339 (162 N.E. 99, 59 A.L.R. 253)], the problem of the duty owed the foreseeable plaintiff. (See generally, Prosser, Palsgraf Revisited, in Selected Topics on the Law of Torts: Prosser (1954) pp. 191-242.) Although *Dillon* concerns liability for a particular kind of injury, the liability was analyzed as a question of duty to the person injured, a third party. That was viewed as derivative of the injury and hence of the liability for the death of the child. "In the absence of the primary liability of the tortfeasor for the death of the child, we see no ground for an independent and secondary liability for claims for injuries by third parties." (*Dillon, supra,* at p. 733.) Given primary liability, the court addressed the duty owed a parent for the emotional injury caused by witnessing the child's death. Duty, said the court, is " 'an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' " (*Id.,* at p. 734.) The court conducted its analysis from a perspective of the history of common law redress for emotional injuries. At the common law the duty to avoid the negligent infliction of mental or emotional distress on others was not generally actionable unless it was accompanied by a physical injury or was parasitic to a recognized cause of action. (*Id.,* at pp. 733-739.) This limitation on duty "emanate[d] from the twin fears that courts will be flooded with an onslaught of (1) fraudulent and (2) indefinable claims," and " 'that [otherwise] the law might countenance legal redress for all foreseeable harm.' " (*Id.,* at pp. 734-735, quoting from Fleming, An Introduction to the Law of Torts (1967) at p. 47.) Nonetheless, *Dillon* rejected these considerations as controlling, saying that "[i]n order to limit the otherwise potentially infinite liability which would follow every negligent act, the law

of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable." (*Id.*, at p. 739.)

Having said this, *Dillon* sought to confine the potential reach of foreseeability by limiting it, first, " 'to those risks or hazards whose likelihood made the conduct unreasonably dangerous' " (quoting from 2 Harper & James, The Law of Torts (1956) at p. 1018; fn. omitted), and, second, by employing the (by now) familiar troika of *criteria* ("guidelines") which comprise the bystander rule. (*Id.*, at pp. 739-740.) These criteria, the nature of the injury, and its causal relation to the conduct which caused it, condition the application of foreseeability and provide principles for the measurement of the duty. *Dillon* left open the development of further criteria by emphasizing that "no immutable rule can establish the extent of that obligation [arising from foreseeability of risk] for every circumstance of the future." (*Dillon,* at p. 740.)

That opening was pursued in *Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669]. There the court broadened the recovery available for the [parasitic] cause of action for loss of consortium to include "the mental and emotional anguish" of a wife whose husband was transformed from an active partner into an invalid by an injury negligently inflicted on him at work. The court said, following *Dillon*: "The foreseeable risk need not be of an actual physical impact, but may be of emotional trauma alone. [Citation.] Whether a risk is sufficiently foreseeable to give rise to a duty of care depends on the circumstances of each case, including the relationship of the parties and the nature of the threatened injury." (*Id.*, at p. 399.)

Soon after *Rodriguez* a reaction to *Dillon*'s initiative set in. In two cases, *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858] and *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871], the Supreme Court was asked to extend *Dillon*'s grounding in foreseeability to encompass a novel cause of action for loss of parent-child consortium. The court decided the social burden of this expansion of liability was unwarranted. It adopted the rationale of cases which forthrightly acknowledged that *Dillon*'s limitations on duty are informed by more than lack of foreseeability. It said: " 'Nevertheless our decision must take into account considerations in addition to logical symmetry and sympathetic appeal. . . . [N]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere. In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, a decision which is essentially *political*.' " (*Borer, supra,* at pp. 446-447; italics added.)

*Borer* and *Baxter* were immediately followed by *Justus* v. *Atchison* (1977) 19 Cal.3d 564 [139 Cal.Rptr. 97, 565 P.2d 122]. The issue addressed, framed by the characterization given it by the parties, was whether to fashion a cause of action for the wrongful death of a stillborn fetus. (*Id.*, at pp. 568-582.) Only after this novel request was denied (on grounds of statutory construction) did the court address the claim that negligent treatment inflicted actionable mental distress in the father of the stillborn. The analytic mold in which the question was cast formed the crucible for the court's answer: did the father state a *"Dillon* cause of action"? (See *Justus, supra,* at pp. 582-585.) The court answered "no" because the "accident" which injured the child did not simultaneously shock the father. "Here, although each plaintiff [father] was in attendance at the death of the fetus, that event was by its very nature hidden from his contemporaneous perception . . . ." (*Id.*, at p. 584.)

The import of *Justus* is clear: *Dillon* is not the harbinger of a boundless new tort of negligent infliction of emotional distress. Rather, it is a unique wrinkle in the law of tort which is limited by its criteria to a parent transfixed with horror at the sight of an injury happening to his or her child. Liability extends to persons not physically injured only for harms foreseeably caused by perception of the event of the physical injury.[4]

After *Baxter, Borer,* and *Justus,* one might have predicted *Dillon* would be shunted to a sidetrack in the law of tort. A notion of limited duty, roping off the slippery slope of boundless litigation, was rekindled and the incursion of pure foreseeability cauterized. However, this was not to be. The *Justus* majority made no mention of *Baxter* or *Borer* and there was no cinching up of liability by their criterial threads.[5] *Dillon* was not sterile, only fallow. Then came *Molien* v. *Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813, 16 A.L.R.4th 518] in which the plaintiff sought recovery for a misdiagnosis of syphilis in his wife which led to disruption of the marital relationship and emotional distress. The Supreme Court agreed the husband had a claim for medical malpractice. *Dillon* and *Rodriguez* were at the forefront of supporting authorities. (*Molien, supra,* at p. 923.) This was explained on the ground that the intangible injury to the plaintiff-husband was "reasonably foreseeable," "easily pre-

---

[4]The plaintiff parents in this case could not state such a *"Dillon* cause of action," regardless of the contemporaneity of their perception of the birth of the child and his genetic affliction. The "injury" to the child occurred, as in *Justus, in utero,* presumably at the moment of conception. Accordingly, there is no manner in which there could be shock from witnessing the harming event. Thus, the sole fact which defendant produced was entirely unnecessary to resolution of the *Dillon* issue he posed.

[5]A point for which the majority was chastised in the concurrence of Justice Tobriner. (*Justus, supra,* 19 Cal.3d at pp. 586-587, conc. opn. of Tobriner, Acting C. J.)

dictable," and "rational to anticipate." (*Ibid.*) The cap on *Dillon*'s foreseeability analysis, implicit in the reasoning of *Justus,* was evaded with the observation that this was not a *Dillon* cause of action; "Here, by contrast, plaintiff was himself a *direct victim* of the assertedly negligent act." The case is, said *Molien,* "factually dissimilar to the bystander scenario." (*Ibid.*; italics added.)

The problem which arises from this cryptic explanation is: how are we to distinguish between "direct victim" cases and "bystander" cases? An impression is given that the foreseeability of the particular injury to the husband alone explains the result. The inference suggested is that a "direct victim" is a person whose emotional distress is a reasonably foreseeable consequence of the conduct of the defendant. This does not provide criteria which delimit what counts as reasonable foreseeability. It leads into the quagmire of novel claims which the Supreme Court foresaw as an unacceptable consequence of a "pure" foreseeability analysis in *Baxter* and *Borer.* How then can we distinguish "direct victims" from "bystanders"? Or more concretely, why was Mr. Molien in the former class?

It is fruitful, we think, to approach this problem without the mind set engendered by generalized notions of "negligent infliction of emotional distress." It is important to analyze *Molien*'s relationship with the defendant in the action. For that purpose we turn to an earlier measure of duty.

In *Biakanja* v. *Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358] the Supreme Court examined the liability of a contracting defendant for a tortious breach of contract which injured a third person not in privity with the defendant. (*Id.,* at p. 650.) The plaintiff was the intended beneficiary of a contract between his brother and a notary engaged to draw a will. The brother intended that plaintiff be the sole heir of his estate. Plaintiff was reduced to a one-eighth intestate share as a result of a defect in the will caused by the unlawful and inadequate practice of law of the notary public who drew the will. (*Id.,* at p. 648.) "There was little question as to the breach of duty—the negligent act . . . . The difficulty was in recognizing a duty to *plaintiff.*" (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 618, p. 2900; italics in original.) "The principal question is whether defendant was under a duty to exercise due care to protect plaintiff from injury and was liable for damage caused plaintiff by his negligence even though they were not in privity of contract." (*Biakanja, supra,* at p. 648.) The *Biakanja* court found the duty to the plaintiff in his relationship to the defendant as a kind of third party beneficiary of the contract.

It did so on policy grounds. "The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter

of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (*Id.*, at p. 650.) The court concluded the plaintiff was a *direct* victim of the negligence because these policy factors favored an extension of the duty arising out of the contractual relationship with him.

The "direct victim" requirement of *Molien* can be analyzed along *Biakanja* lines. Mr. Molien was a direct victim of Kaiser's negligent omissions or actions which they had a duty to avoid as a result of the physician-patient relationship. With respect to the misdiagnosis of communicable sexual disease it must be said, as it was in *Biakanja,* that an "end and aim" of the transaction with Mrs. Molien *directly* implicated the interests of Mr. Molien. The injury was not merely derivative of an injury to his spouse, i.e., indirect. Both Mr. and Mrs. Molien's interests in harmonious relations with their spouses were impinged by the inherent influence of Kaiser's misbehavior. Mr. Molien's interest in avoiding anxiety that *he* had contracted the disease was simultaneously impinged.

What flows from viewing *Molien* as a *Biakanja* case? Importantly, the issue of "direct" or "bystander" modality is informed by the *Biakanja* criteria which condition foreseeability as the measure of actionability. It removes the cause of action in *Molien* from the amorphous nether realm of negligent infliction of emotional distress to medical malpractice. The root problem with viewing a tort, the gist of which is negligent infliction of mental distress, from the perspective of a new cause of action is that foreseeability of the harm looms as the paramount criterion. But foreseeability, without more, provides what *Borer* would describe as an unworkable delineation of the extent of a tortfeasor's liability. This problem is alleviated if the analysis is recharted from within the established doctrines of recognized torts that address the question of the foreseeable victim. Then the focus shifts to the policy calculus by which an existing duty is extended.[6]

---

[6]A second difficulty which follows from the turbulent wake of *Dillon* is that the backlash to its analytic formlessness has confused the damage issues in established torts. (Compare *Jarchow* v. *Transamerica Title Ins. Co.* (1975) 48 Cal.App.3d 917 [122 Cal.Rptr. 470] with *Quezada* v. *Hart* (1977) 67 Cal.App.3d 754 [136 Cal.Rptr. 815]; see 4 Witkin, Summary of Cal. Law (1984 Supp.) §§ 553, 553A, 553B, pp. 342-346.) Civil Code section 3333 provides the measure of damages in tort: "[E]xcept where otherwise expressly provided by this Code, [it] is the amount which will compensate for all the detriment proximately caused thereby . . . ." Misgivings about the utility of damages to compensate for mental distress which derive from the mind-set of the *Dillon* debate have affected consideration of the availability of such relief in well-established torts. This confusion stems from a fundamental

In this case we perceive both parents to be direct victims of the malpractice alleged. Mrs. Andalon was a party to the contract with the defendant and no issue of his duty to advise her concerning mongolism is tendered at this stage of the action. Mr. Andalon's interest in the receipt of information and advice on this topic mirrors hers. His injury is not merely derivative of Mrs. Andalon's injury but flows from his role as a participant in the reproductive life of the marital couple[7] and its lawful choices. The burdens of parental responsibility fall directly upon his shoulders. The tort duty arising from the contract, between defendant and Mrs. Andalon, runs to him, not merely because of the foreseeability of emotional harm to him, but because of the nexus between his significant interests and the "end and aim" of the contractual relationship. He is manifestly a direct beneficiary of tort-duty imposed by virtue of the doctor-patient relationship.

We draw support for this conclusion, albeit sub silento, from *Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884] which overruled a demurrer to the complaint of a father and mother for damages arising from the pregnancy and the birth of a healthy infant following the failure of an operation undertaken to accomplish *her* sterilization. (*Id.,* at p. 307.) *Custodio* supports the conclusion that an incident of such a tort claim is compensation for foreseeable mental suffering. (*Id.,* at p. 323; accord *Stills* v. *Gratton* (1976) 55 Cal.App.3d 698, 709 [127 Cal.Rptr. 652]; also see *Karlsons* v. *Guerinot* (1977) 57 App.Div.2d 73 [394 N.Y.S.2d 933].)

Defendant attempts to distinguish *Molien.* He argues *Molien* only applies if an incorrect diagnosis is given and not if a correct diagnosis is withheld.

conceptual distinction between traditional views of duty as premised upon particular relationships between the plaintiff and defendant and duty which arises out of foreseeability of harm. This latter conception of duty "has two aspects, one limiting responsibility to something less than the harm which the negligent act would on commonsense principles be said to have caused, the other extending it beyond such harm. The limiting doctrine is that a defendant is not liable for unforeseeable harm even if, on the common-sense principles . . . he caused it; the extending doctrine is that he is liable for foreseeable harm of which his act is a necessary condition even if, on common-sense causal principles, he did not cause it." (Hart and Honore, Causation in the Law (1959), pp. 231-232.) Legal analysis, unlike addition, is not commutative. To put it in more earthy terms, success in mounting the horse may vary with the side from which it is approached. A misapproach may leave one looking at the wrong end of the horse.

[7]This is not to say that her views are not paramount or that the defendant was obliged to advise Mr. Andalon in any manner save through Mrs. Andalon, at her discretion. (See *Rosenberg* v. *Feigin* (1953) 119 Cal.App.2d 783 [260 P.2d 143]; compare *Call* v. *Kezirian* (1982) 135 Cal.App.3d 189, 193 [185 Cal.Rptr. 103].) However, if the couple can prove that Mr. Andalon would have been consulted by Mrs. Andalon concerning the issues of detection of mongolism and response to its detection we perceive no infringement on the primacy of the doctor-patient relationship. (Compare *Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 344 [134 Cal.Rptr. 375, 556 P.2d 737].)

This is not a principled basis for distinction. The results of nondiagnosis, where diagnosis is due (see *Call* v. *Kezirian, supra,* 135 Cal.App.3d 189), as here, may be fully as harmful as an incorrect diagnosis. Nonfeasance when a relationship gives rise to a duty to act is no less culpable than malfeasance. (See *Truman* v. *Thomas* (1980) 27 Cal.3d 285 [165 Cal.Rptr. 308, 611 P.2d 902].) The duty to Mr. Andalon arose out of the doctor-patient relationship with Mrs. Andalon. (See *Call, supra.*)

### III

Defendant also raised an issue of law concerning damages for the child's cause of action for wrongful life.[8] No claim is made the child has pled no cause of action. (See *Call* v. *Kezirian, supra*; see generally Annot., Tort Liability for Wrongful Birth (1978) 83 A.L.R.3d 15.) Defendant asserts the plaintiff-child may not recover general damages in a wrongful life case and consequently may not recover compensation for loss of earning capacity attributable to his genetic defect. He argues both questions are controlled by *Turpin* v. *Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954]. Petitioners agree concerning the first question and disagree regarding the second.

In *Turpin* the plaintiff-child alleged she was born totally deaf as the result of a genetic defect; the defendant doctors negligently failed to diagnose this condition in her older sister; the nature of the condition is such that there is a reasonable degree of medical certainty the hearing defect would be inherited by any offspring of her parents; and, had the defendant-doctors properly informed her parents, they would not have conceived her. (*Id.,* at pp. 223-224.) She sought general damages for the deafness and special damages for " 'extraordinary expenses for specialized teaching, training and hearing equipment' " needed as a result of her deafness. (P. 224.) The Supreme Court held that the plaintiff-child is not entitled to general damages (p. 237) but that she is entitled to the special damages for which she prayed. (P. 239.)

That leads us to ask what meaning should be ascribed to *Turpin*'s statement that the plaintiff-child in a wrongful life case may not recover general

---

[8]Despite the inaptness of section 437c for resolution of this issue we will discuss it here. The legal issue could have been posed, post pleadings, as a motion *in limine* to preclude introduction of evidence of the child's lost earnings. We discern no violence to the forms of litigation from viewing the misnamed section 437c motion as functionally equivalent. No disputed facts are pertinent, as all concede the nature of the child's claim. Resolution of the issue will likely enhance the chances of pretrial settlement of the child's case or materially assist the litigants in preparation and conduct of the trial. (Cf. *Holben* v. *Midwest Emery Freight System, Inc.* (W.D.Pa. 1981) 525 F.Supp. 1224, availability of punitive damages assuming liability is appropriate under federal summary judgment provision.)

damages. In pristine legal parlance general damages and special damages are pleading words. ■ "Damages which *necessarily* result from the act complained of are denominated general damages, and may be proved under the *ad damnum* clause or general allegation of damage, while those which are the natural consequences of the act complained of, and not the necessary result of it, are termed special damages." (*Treadwell* v. *Whittier* (1889) 80 Cal. 574, 579 [22 P. 266], see also, e.g., 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 784 et seq.) "From a practical standpoint the concept of general damages means that the pleader must consult the authorities dealing with elements of damages in the particular kind of action to discover which have been classed as general and need not be specified in the complaint." (Witkin, *supra,* at p. 2399.) However, because of its novelty there is a dearth of such authorities defining the elements of damages in a wrongful life case.

Other than *Turpin,* the only California case addressing general and special damages in a plaintiff-child's wrongful life action is *Curlender* v. *Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477]. *Curlender* served as a foil in *Turpin,* and its primary reasoning was rejected. (*Turpin,* 31 Cal.3d at p. 231.) However, the discussion of damages in *Curlender* implies that general damages are limited to pain and suffering. (106 Cal.App.3d at pp. 830-831.) The *Curlender* opinion mentions in passing the child sought, as special damages, the costs of its care. (p. 831.)

*Turpin* echoes the notion that general damages consist of pain and suffering. (31 Cal.3d at pp. 236-237.) However, in *Turpin,* perhaps because the degree of the genetically caused affliction was less severe than the Tay-Sachs disease in *Curlender* (106 Cal.App.3d at p. 815, esp. fn. 4), the plaintiff-child did not include a request for her nonmedical care as special damages. In *Turpin* the special damages approved were the specialized teaching, training and hearing equipment needed as a result of the plaintiff-child's deafness. *Turpin*'s analysis stresses the distinction between these tangible, economically quantifiable costs and the inherently speculative, intangible costs of pain and suffering. (Compare *Turpin,* at pp. 236-237 and 239.) We conclude *Turpin*'s use of the term general damages is limited to recovery for pain and suffering. Other proposed elements of damage must be evaluated pursuant to *Turpin*'s reasoning, but are not controlled by its holding. (Compare *Call* v. *Kezirian, supra,* 135 Cal.App.3d at p. 194.)

■ Adopting this as the context within which to construe the parties' stipulation, we read the agreement of the parties that the plaintiff-child may not recover general damages as a stipulation he cannot recover for pain and suffering attributable to his genetic defect. In view of this resolution, we do not address the question whether a plaintiff-child in a wrongful life action

is entitled to damages for costs of its care other than "extraordinary out-of-pocket" expenses, i.e., special medical expenses attributable to the genetic defect. (Cf. *Custodio, supra,* 251 Cal.App.2d at pp. 322-326; *Turpin, supra,* 31 Cal.3d at p. 238; see generally, Note, *Wrongful Conception: Who Pays For Bringing Up Baby?* (1978) 47 Fordham L.Rev. 418.)[9] We will analyze the remaining disputed issue of the plaintiff-child's damages, i.e., the claim for loss of earning capacity, pursuant to this resolve.

The merits of the plaintiff-child's claim for loss of earning capacity are controlled by the reasoning in *Turpin, supra.* "The gist of plaintiff's claim is that she has suffered harm or damage as a result of defendants' negligent performance of their professional tasks, and that, as a consequence, she is entitled to recover under generally applicable common law tort principles." (*Id.,* 31 Cal.3d at p. 229.) But the claim for general damages founders on the consideration that "if defendants had performed their jobs properly, she would not have been born with hearing intact, but—according to the complaint—would not have been born at all." (*Id.,* at p. 231.) The Supreme Court held recovery of general damages foreclosed because tort remedies are compensatory and such damages "cannot in any meaningful sense compensate the plaintiff for the loss of the opportunity not to be born . . . ." (*Id.,* at p. 237.)

■ The child's claim for loss of earning capacity is defeated by *Turpin*'s reasoning. There is no loss of earning capacity caused by the doctor in negligently permitting the child to be born with a genetic defect that precludes earning a living. One cannot lose what one never had. The plaintiff-child never had a wage-earning capacity that was taken away by the conduct of the doctor and cannot, therefore, claim compensation for its loss. His inability to earn wages is attributable to his genes and, for the present at least, it is meaningless to speak of a doctor altering or ameliorating this circumstance. (Compare *Turpin, supra,* 31 Cal.3d at p. 231, fn. 8.) Accordingly, the trial court was correct in its adjudication of this issue of law.

IV*

. . . . . . . . . . . . . . . . . . . . . .

V

The remaining problem concerns the trial court's denial of the petitioners' motion to amend the complaint. ■ Petitioners argue that denial of the

---

[9]This question is not foreclosed by *Turpin, supra,* and has not been put in issue by the parties. (pp. 236-239.) We imply no opinion concerning the adequacy of petitioners' complaint for placing these damages in issue.

*See footnote 2, *ante.*

motion was an abuse of discretion because they merely seek by it different relief based upon the same set of facts. They confess that their original pleading is insufficient to give clear notice of the claim that the defendant doctor caused direct bodily injury to the plaintiff-mother, i.e., other than as a symptom of the emotional distress at discovery of the child's condition. Nevertheless, they argue this claim is embedded in the allegations of negligent conduct in the original complaint.

The parties agree the standard is provided in *Smeltzley* v. *Nicholson Mfg. Co.* (1977) 18 Cal.3d 932 [136 Cal.Rptr. 269, 559 P.2d 624, 85 A.L.R.3d 121]. That case addresses the permissibility of an amendment to bring a Doe defendant into an action when the statute of limitations would otherwise preclude recovery. *Smeltzley* teaches that such amendment should be permitted whenever the amended complaint seeks recovery on the same general set of facts, i.e., in a tort action where recovery is predicated on the same accident and the same injuries referred to in the original complaint. (*Id.*, at p. 934.)

The issue here is: does petitioners' proposed amendment seek recovery on the same general set of facts stated in the original complaint, i.e., the same negligent conduct and the same injuries? The difficulty in the resolution of the issue is the diffuse allegations in the original complaint. Petitioners first allege in the portion of the complaint setting forth the child's cause of action that the doctor negligently treated, informed, and otherwise cared for the mother in the course of her prenatal condition.[11] This allegation is incorporated in the mother's cause of action where it is further alleged that negligence proximately resulted in the mother being hurt and injured, sustaining injury to her body.[12] Petitioners seek to exploit this

---

[11]The text of this allegation is: "From and after said time, defendants, and each of them, so negligently examined plaintiff RUTH A. ANDALON and failed to follow a reasonable standard of care and practice in treating and informing plaintiff RUTH A. ANDALON with regard to her pregnancy and her genetically defective fetus, and so negligently treated and informed and otherwise cared for RUTH A. ANDALON in the course of her prenatal condition, and so negligently failed to inform RUTH A. ANDALON that her unborn fetus was genetically defective which failure to provide and informed consent for the birth resulted in the unwanted birth of genetically defective minor RYAN J. ANDALON, and so negligently and carelessly supervised, managed, and performed their duties during plaintiff RUTH A. ANDALON's prenatal care, all such conduct falling below the applicable standard of medical care and practice owed to plaintiff RUTH A. ANDALON and said minor plaintiff RYAN J. ANDALON by said defendants, that plaintiff RYAN J. ANDALON sustained the hereinafter referred to injuries."

[12]The text of this allegation is: "As a proximate result of the said negligence of the defendants, and each of them, as hereinabove set forth, and in failing to inform [the mother] of the genetic testing that could be undertaken to ascertain if she was running the risk of giving birth to a genetically defective child, which was all below the standard of medical care required of physicians, surgeons, hospitals, nurses, etc., plaintiff was hurt and injured in her health, strength and activity, sustaining injury to her body and shock and injury to

vague statement of facts. They argue the assertion they now tender, that the doctor injured the mother's body directly by negligent treatment before, during and after the child birth, can be impressed upon the language.

The general set of facts which underlies a claim of infliction of bodily injury by negligent medical treatment is distinct from a general set of facts which underlies infliction of emotional distress by negligent failure to detect Down's syndrome *in utero* or to properly apprise a pregnant woman of that prospect. The instrumentality of causation of bodily injury is different in each case. (Cf. *Coronet Manufacturing Co.* v. *Superior Court* (1979) 90 Cal.App.3d 342 [153 Cal.Rptr. 366].) If petitioners' original complaint was meant to tender both claims it must contain two sets of factual allegations however inartfully jumbled. A review of the allegations on which petitioners would rely, in context, refutes this proposition.

The paragraph which sets forth the alleged negligent conduct of the doctor (fn. 9, *ante*) is immediately followed with another in which petitioners assert: "As a direct and proximate result of *said* conduct of defendants, and each of them, plaintiff RYAN J. ANDALON was born with irreparable brain damage . . . ." (Italics added.) The compelling implication of this juxtaposition is the negligent conduct alleged is failure to detect the child's genetic defect. But the paragraph which sets forth the alleged bodily injury to the mother relies upon this same negligent conduct. And the language which sets forth the injury to the *father* is word-for-word the same as that stating the injury to the mother. The father was not "treated" by the doctor and can only seek redress for bodily injury occasioned as a symptom of emotional distress. These considerations dispel any inference the statement of the facts of the mother's injury was intended to set forth two instrumentalities of bodily injury. In view of these circumstances we reject the argument that petitioners' proposed amendment is a new claim for relief premised on the same general set of facts presented in their original pleading.

## DISPOSITION

The alternative writs are discharged. A peremptory writ shall issue directing the trial court to vacate its order granting defendant's motion for partial summary judgment.

Puglia, P. J., concurred.

---

her nervous system and person, all of which said injuries have caused and continue to cause plaintiff great mental, physical and nervous pain and suffering, and emotional distress. Plaintiff is informed and believes and thereon alleges that said injuries will result in some permanent disability to plaintiff, all to her general damage in excess of $15,000.00.''

**EVANS, J.**—I concur in the result which orders a peremptory writ issue directing the trial court to vacate its order granting petitioners' motion for partial summary judgment.

I view parts I and V of the opinion as totally dispositive of the writ petition. I perceive parts II, III, and IV as extraneous, interesting dissertations on a fascinating topic; however, they are totally lacking in necessity in this proceeding and would be better suited for exposition in a law review as an expression of the writer's opinion.

I conform my concurrence to the reasoning and conclusion reached in *Turpin* v. *Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954]. That court succinctly summarized the extent to which such an action may be pursued and ultimately compensated in damages. "In sum, we conclude that while a plaintiff-child in a wrongful life action may not recover general damages for being born impaired as opposed to not being born at all, the child—like his or her parents—may recover special damages for the extraordinary expenses necessary to treat the hereditary ailment." (*Id.*, at p. 239.)

Any expansion of the right to recover damages in a wrongful life cause of action by either the parent or the child should be left to the legislative process and not suggested by judicial dicta.