[Civ. No. 45429. Second Dist., Div. One. Feb. 23, 1976.]

JOHN MOBALDI, a Minor, etc., et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA et al., Defendants and Respondents.

574

**COUNSEL**

Edwin C. Martin, Jr., and Gerald H. B. Kane, Jr., for Plaintiffs and Appellants.

Schell & Delamer, Fred B. Belanger and J. Thomas Hunsucker for Defendants and Respondents.

**OPINION**

**THOMPSON, J.**—This is an appeal from a judgment of dismissal after a demurrer was sustained to plaintiffs' complaint without leave to amend. It concerns primarily the construction of the guidelines of *Dillon* v. *Legg*, 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], governing determination of foreseeability of emotional trauma through sensory perception of physical injury negligently inflicted upon another for the purpose of defining the negligent person's liability to the one emotionally traumatized. In particular, the case at bench involves the guideline requirements that: (1) the emotionally traumatized plaintiff be "closely related" to the immediate victim of the defendant's negligence; and (2) the emotional trauma result from "a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident." (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 740.)

We conclude that where, as here, the victim immediately injured and the plaintiff hold themselves out to the public as mother and child, the child is treated as a filial member of a foster mother's family,

the child treats the foster mother as a mother, and the tortfeasor treats the two as mother and child, the relationship guideline is satisfied although the injured child is neither the natural nor adopted offspring of the emotionally traumatized foster mother. ■ We conclude, also, that where, as here, the plaintiff perceives by sight and hearing the physical injury to another in her presence caused by the defendant's negligence, the guideline requirement of direct emotional impact from sensory and contemporaneous observation of the accident is satisfied, although the plaintiff may not be aware of the precise nature of the negligence.

### Facts

The procedural posture of the case is unusual. After a demurrer was filed to plaintiffs' complaint, declarations of fact were filed by the parties and wisely considered by the trial court to determine the amendability of the complaint to state a cause of action in the event it was not legally sufficient as originally filed. Because the principal inquiry on this appeal is the propriety of trial court action sustaining the demurrer without leave to amend, we recite the facts as stated in plaintiffs' declarations on the theory that the complaint is amendable to allege those facts.

Plaintiffs Patricia and Harry Ramsburg are married. Motivated by her own experience as a foster child, Mrs. Ramsburg for several years had acted as a foster parent receiving compensation for her service. In March of 1970, John Patrick Mobaldi, then five months old, the child of an unwed mother, was placed by the Los Angeles County Department of Adoptions with the Ramsburgs as a foster child. John had been born with a severe kidney defect likely to result in his early death. He was a particularly attractive child in appearance and personality.

John quickly became integrated into the Ramsburg family and was treated as a family member equally with the Ramsburgs' natural children. The Ramsburgs attempted to adopt John but were frustrated in that effort by a county policy against adoption of seriously ill children. The Ramsburgs caused John to be baptized in their church, christening him "John Patrick Mobaldi Ramsburg."

From birth, John was treated for his congenital kidney defect at the UCLA Medical Center. Initial reconstructive surgery was performed in July of 1972 and John's health improved greatly. By November of 1972, John was active and "getting along well." Personnel of the Medical

Center referred to John and Mrs. Ramsburg as mother and child, and that reference is constantly repeated in the medical records of the center.

On May 24, 1973, Mrs. Ramsburg took John to the UCLA Medical Center for tests. When John cried, "Mommy, Mommy, I want you. I can't see you," Mrs. Ramsburg, at the request of the attending physician, entered the room where the tests were being administered to calm John. She held John in her arms as an injection of glucose solution and dye was injected intravenously for the purpose of a pyelogram, an X-ray procedure designed to make the kidneys appear more clearly in the picture. The procedure calls for the dye to be injected as a part of a 5 percent glucose solution. By mistake, one of the physicians used a 50 percent mixture of glucose, a drastically unsafe solution. After injection commenced, all of the physicians left the room to examine X-rays taken to that point. The infusion was left running into John's vein.

While in Mrs. Ramsburg's arms, John began to breathe in a peculiar manner. Within a short time he became spastic and convulsant and finally comatose. Mrs. Ramsburg screamed. By the time the physicians returned to the room in response, John had received 150 cubic centimeters of the overstrength solution. As a result, he suffered irreversible brain damage and was made permanently blind and quadraplegic, severely retarded, subject to seizures, and generally comatose.

Her experience in witnessing the incident caused Mrs. Ramsburg to become severely depressed. She lost 40 pounds from May 23, 1973, through September of that year, suffered from insomnia, despair, and futility to the extent that she sometimes became bedridden. Mrs. Ramsburg has been treated by a psychiatrist and the prognosis for her full recovery is only fair.

*Pleadings*

The complaint which commenced the case at bench was filed on September 24, 1973. The first cause of action is alleged in professional negligence on behalf of John by the Ramsburgs as his guardians ad litem. The second cause of action seeks expenses of past and future care of John and damages for loss of his services and companionship. The third cause of action is asserted on behalf of Mrs. Ramsburg. It alleges the negligent infusion of the overstrength solution, Mrs. Ramsburg's presence while the solution was injected and the damage done, and the

physical consequences of the resulting emotional distress to her. The third cause of action does not allege the detail of the relationship of John to the Ramsburg family, asserting only that the Ramsburgs are the guardians [of the person] of John.

Defendants, the UCLA Medical Center and the attending physicians who are its agents, demurred to the second and third causes of action. Memoranda in opposition to the demurrer contain the additional information recited in our statement of facts. The demurrer was sustained without leave to amend. On March 27, 1974, John died so that the first cause of action alleged on his behalf alone was dismissed. Pursuant to Code of Civil Procedure section 581, subdivision (3), the second and third causes of action were dismissed because the demurrer to them had been sustained without leave to amend. This appeal followed.

### Third Cause of Action—Dillon v. Legg

Before June of 1968, the result of the case at bench would have been clear cut. Since Mrs. Ramsburg seeks recovery for the results of emotional distress negligently inflicted upon her without an accompanying personal physical trauma where she herself was not within the zone of danger flowing from the defendants' conduct, the law of California until that time barred her recovery. (*Amaya* v. *Home Ice, Fuel & Supply Co.*, 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513].)

*Dillon* v. *Legg, supra,* 68 Cal.2d 728, decided in June of 1968, changed the California law. There our Supreme Court considered the right to compensation of a mother who suffered emotional trauma and consequent physical injury from witnessing the negligently caused death of her child. The court recognized that the rule of *Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295, decided by it five years earlier, denied recovery for negligently caused mental or emotional disturbance, and consequent illness, flowing from injury to a third person unless the plaintiff was himself within the zone of danger through fear for his own safety arising out of the same negligent act. It noted, also, that the *Amaya* rule was based upon a concept of a lack of duty which prevented recovery despite foreseeability of the emotional trauma and consequent injury. Rejecting the concepts of limited duty and zone of danger applied in *Amaya,* and the rationale for the concepts, our Supreme Court in *Dillon* overruled its earlier decision and held the mother could recover for her physical injuries occasioned by her emotional trauma.

The *Amaya* court had expressly considered the concept of duty as wholly separate from the concept of foreseeability of injury (59 Cal.2d at p. 308) and treated it as a policy limitation upon recovery in tort (59 Cal.2d at p. 309). The court had adopted its policy of limitation of liability for negligently inflicted emotional distress on the theory that a general rule permitting recovery would open the way to fraudulent claims by reason of the "difficult medical question ... presented when it must be determined if emotional distress resulted in physical injury" (59 Cal.2d at p. 311). Equally persuasive to the *Amaya* court were "the problem of setting some limits to such liabilty" (59 Cal.2d at p. 312), the social policy against total shift of loss from the victim to the tortfeasor (59 Cal.2d at p. 314), and the proposition that permitting recovery would be " 'wholly out of proportion to the culpability of the negligent tortfeasor' " (59 Cal.2d at p. 315).

The *Dillon* court totally rejected the *Amaya* reasoning. It prefaced its discussion by the statement: "The assertion that liability must nevertheless be denied because defendant bears no 'duty' to plaintiff 'begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. . . .' " (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 734, quoting from Prosser, Law of Torts (3d ed. 1964) pp. 332-333.) Discarding the *Amaya* policy rationale that the possibility of fraudulent claims and the difficulty of establishing limits to liability for emotional distress justified the rule barring recovery, the *Dillon* court focused on the doctrine of foreseeability which the *Amaya* court had rejected, and treated it as the foundation of recovery. (68 Cal.2d at pp. 739-740.)

*Dillon* establishes the analytical frame for determination of foreseeability of emotional trauma through injury to another. It limits recovery to situations in which emotional shock suffered by the plaintiff results in physical injury. In such a case, foreseeability of injury, which is determinative of the negligent defendant's liability, depends upon "such factors as . . . (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 740-741.) *Dillon* continues: "The evaluation of these factors will indicate the

*degree* of the defendant's foreseeability: obviously defendant is more likely to foresee that a mother who observes an accident affecting her child will suffer harm than to foretell that a stranger witness will do so. Similarly, the degree of foreseeability of the third person's injury is far greater in the case of his contemporaneous observance of the accident than that in which he subsequently learns of it. The defendant is more likely to foresee that shock to the nearby, witnessing mother will cause physical harm than to anticipate that someone distant from the accident will suffer more than a temporary emotional reaction. All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 741.)

Application of the analytical frame is explained by the *Dillon* court which states: "In light of these factors the *court* [italics added] will determine whether the accident and harm was *reasonably* foreseeable. Such reasonable foreseeability does not turn on whether the particular plaintiff [*sic*] as an individual would have in actuality foreseen the exact accident and loss; it contemplates that *courts* [italics added], on a case-to-case basis, analyzing all the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen. The *courts* [italics added] thus mark out the areas of liability, excluding the remote and unexpected." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 741.)

The *Dillon* court treats foreseeability as a limitation upon liability for negligently inflicted emotional distress and one which is to be applied by the court rather than the trier of fact. While rejecting the duty-zone of danger limitation of *Amaya, Dillon* imposes its own court-developed standard, characterized as foreseeability, which limits the scope of liability. (See *Dillon* v. *Legg, supra,* 68 Cal.2d 728, 748 et seq., dis. opn. of Justice Burke; see also Comment, 35 Montana L.Rev. 351.) To that extent, *Dillon* has preserved a public policy limitation upon loss shifting and hence liability. It has not, however, defined the precise parameters of the policy, leaving those for determination on a case-by-case basis. Application of the *Dillon* rule by a court lower than the Supreme Court to a factual situation not precisely that presented in *Dillon* thus involves prophecy as well as reason.

Reason dictates and prophecy indicates that the facts of the case at bench satisfy the *Dillon* v. *Legg* guidelines.

Mrs. Ramsburg was as present at the scene of the accident causing physical injury to John and emotional distress and consequent physical damage to her as it is possible to be. At defendants' instance, she held John in her arms as defendants negligently infused the dangerous solution.

The case at bench differs from *Dillon* in three respects. In *Dillon,* the relationship between the plaintiff suffering emotional trauma and the victim suffering physical trauma was that of natural mother and child, while here the relationship is that of a foster mother and child living together with all the nonlegal incidents of a parent-child relationship. The instant case differs from *Dillon* also in that in *Dillon* the tortfeasor was unaware of any relationship between the child he killed and the mother who sued, while here the defendants knew that John and Mrs. Ramsburg treated each other as mother and child. In *Dillon,* the emotionally traumatized mother saw the automobile hit her child, while in the case at bench Mrs. Ramsburg observed the results of defendants' negligence and the act which caused the injury but was not aware of the negligent character of defendants' conduct.

### Close Relationship

■ Despite the first difference and in part because of the second, the relationship between John and Mrs. Ramsburg satisfies the logic of the "close relationship" guideline of *Dillon.* The "close relationship" element of *Dillon* is expressed as one test of foreseeability that negligent infliction of injury upon one person will cause emotional distress and consequent physical harm to another. ■ The emotional attachments of the family relationship and not legal status are those which are relevant to foreseeability. In the context of the case at bench, it is much more foreseeable that the infliction of harm upon John would cause severe and particular emotional distress upon those who had assumed the position of his parents than it would be that harm to John would cause particular emotional distress to his natural mother and father who had abandoned him. Foreseeability is buttressed in the case at bench by the proposition that defendants knew the nature of the relationship of John and Mrs. Ramsburg.

The public policy limitation on loss shifting inherent in the *Dillon* v. *Legg* guidelines seemingly does not limit the close relationship requirement to one of blood, marriage, or adoption. The guideline is expressed as "contrasted with an absence of any relationship or the presence of

only a distant relationship." (68 Cal.2d at p. 741.) It can be construed as expressing a policy against shifting the loss caused by negligence to the tortfeasor, and through insurance to the public, in either of two situations. Our Supreme Court may have delineated the policy in terms of the stated contrast—a policy against loss shifting where there is an absence of, or distant relationship only, between the two persons injured by the tort. Or our high court may have considered that loss was to be shifted only in situations of a "close relationship" analogous to that present in *Dillon.*

■ The facts of the case at bench meet the qualifications for loss shifting, whichever of the two constructions is applied. There is a relationship of foster mother and foster child. The relationship is not distant. Because the relationship possesses all of the incidents of parent and child except those flowing as a matter of law and because the latter incidents such as inheritance are essentially irrelevant to considerations limiting recovery in tort directly damaging the plaintiff, the relationship is analogous to that existing in *Dillon.*

### Direct Emotional Impact

■ Despite the proposition that Mrs. Ramsburg was not aware that negligence of the defendants was the cause of the destruction of the child she held in her arms, her observation of the effects upon John satisfies the logic of *Dillon's* guideline that her emotional trauma result from "a direct emotional impact . . . from the sensory and contemporaneous observance of the accident." (68 Cal.2d at p. 740.) ■ That guideline, too, is expressed as one test of foreseeability that negligent infliction of injury upon one person will cause emotional distress and consequent physical harm to another. Foreseeability depends upon what the emotionally traumatized plaintiff observes. It is observation of the consequences of the negligent act and not observation of the act itself that is likely to cause trauma so severe as to result in physical injury.

So long as the plaintiff's observation of the results of the defendant's infliction of harm upon another is direct and contemporaneous, there is no significance in the plaintiff's lack of awareness that the defendant's conduct inflicting the injury is negligent. To reason otherwise would deny the protection of *Dillon* to a mother observing a child killed by a driver, whose only negligence is his intoxication, simply because the mother can not be aware of the fact of drunkenness until after the accident.

The public policy limitation on loss shifting inherent in the *Dillon v. Legg* guideline requiring a "direct emotional impact" has, however, been applied by the Court of Appeal to require strict construction of the guideline.

*Jansen v. Children's Hospital Medical Center,* 31 Cal.App.3d 22 [106 Cal.Rptr. 883], denies recovery to a mother emotionally traumatized by observing her child suffer over an extended period of time and die a painful death because the defendant negligently failed to diagnose a penetrating duodenal ulcer. *Jansen* rationalizes its result in part upon a construction of the *Dillon* guidelines as absolutely requiring a "sudden and brief event causing the . . . injury [to the closely related person]." (31 Cal.App.3d at p. 24.) "More important" to its decision (31 Cal.App.3d at p. 24) is its construction that the public policy limitation upon loss shifting contained in *Dillon* precludes recovery unless "the event causing the injury . . . itself . . . [is] one which can be the subject of sensory perception." Otherwise, declares *Jansen,* the result "could well approach the 'potentially infinite liability' which Dillon purports to avoid." (31 Cal.App.3d at p. 24.)[1]

Gratuitous dictum in *Hair v. County of Monterey,* 45 Cal.App.3d 538, 544 [119 Cal.Rptr. 639], goes further. It characterizes *Jansen* as imposing a requirement that the "tortious event [causing emotional trauma] be susceptible of understanding observance by the plaintiff."

In essence, *Jansen* construes *Dillon* as imposing a public policy limitation upon shift of loss from tortious conduct causing emotional distress by requiring that the plaintiff observe an act contemporaneously causing injury. The *Hair* dictum implies a greater restriction as a matter of public policy by its dictum that the act causing the harm be not only observed but also comprehensible as negligent conduct. The limitation imposed by *Jansen* is compatible with the rule of *Dillon,* but the dictum of *Hair* is not.

*Dillon* expressly requires that a line be drawn somewhere limiting recovery for damage flowing from tortious conduct causing physical damage to another and consequent injury through emotional distress to the plaintiff. The line drawn must be consistent with the purpose of the

---

[1]The *Jansen* reasoning was extended in *Justus v. Atchison* (Cal.App.) to deny recovery to a father observing the negligent delivery of a stillborn son where the father was not informed until after delivery that his son was born dead. Hearing has been granted (Feb. 5, 1976, L.A. 30574, 30575) in *Justus.*

*Dillon* extension of liability in negligence or related to the reason for the *Dillon* limitation.

The *Jansen* restriction is related to the reason for the *Dillon* limitation. It recognizes that to avoid "potentially infinite liability" (*Jansen v. Children's Hospital Medical Center, supra,* 31 Cal.App.3d 22, 24) *Dillon* draws its limitation in terms of a very close connection in time and geography between the negligent act and resulting injury.

In contrast with the *Jansen* application of *Dillon,* the limitation upon *Dillon's* scope tossed out by the *Hair* court is not compatible with the purpose of the *Dillon* extension of liability in tort or related to the reason for the *Dillon* limitation upon the extension. *Dillon* extends liability for negligence causing emotional distress and consequent physical harm because there is "no good reason why the general rules of . . . negligence . . . should not govern [recovery]." (*Dillon* v. *Legg, supra,* 68 Cal.2d 728, 746.) It limits the circumstances under which the damage is recoverable by a requirement of close connection of perception, time, and geography in order to avoid an overly broad scope of liability and consequent shift of loss which our Supreme Court deems socially undesirable. The *Hair* dictum that *Dillon* applies only where the "tortious event [is] susceptible of understanding observance by the plaintiff" (45 Cal.App.3d at p. 544) ignores the general rules of negligence and thus is contrary to *Dillon's* announced rationale. The requirement limits liability and loss shift only fortuitously so that it possesses no rational relationship to the reasons for the *Dillon* limitation. Whether a defendant's conduct may be understandably observed by the emotionally traumatized plaintiff to be negligent depends solely upon the circumstances of the particular victim of emotional distress. The fact is unrelated to the requisite close connection in perception, time, and geography of the defendant's negligent conduct and its reaction upon the plaintiff.

■ We thus conclude that the facts incorporated in plaintiffs' declarations are sufficient to satisfy the logic and policy of the *Dillon* guidelines. While the third cause of action of the complaint as filed is insufficient to state a cause of action because of its failure to allege the facts of the relationship between John and Mrs. Ramsburg, it is amendable to state those facts. Consequently, the trial court erred in sustaining the demurrer to the third cause of action without leave to amend.

*Second Cause of Action*

The second cause of action of the complaint is asserted on behalf of Mr. and Mrs. Ramsburg and alleges, in effect, the loss of society and companionship of John as a result of defendants' negligence. The demurrer was also sustained without leave to amend that cause of action. Plaintiffs'-appellants' opening brief states that the second cause of action is not involved in this appeal. In their closing brief, plaintiffs assert that the second cause of action is legally sufficient by reason of *Hair* v. *County of Monterey, supra,* 45 Cal.App.3d 538, 544 et seq. They seek to excuse their failure to raise the issue on opening brief by the fact that *Hair* did not appear in the West California Reporter advance sheets until about two weeks prior to the time that their opening brief went to press.

Ordinarily, absent good reason to the contrary, a point raised for the first time in a closing brief should not be considered on appeal because of unfairness to the respondent. (6 Witkin, Cal. Procedure (2d ed.) Appeal, § 442.) Here, however, the case at bench must be remanded to the trial court to permit plaintiffs to amend their third cause of action. If at that time they can amend their second cause of action to one legally sufficient under the standards of *Hair,* they should be permitted to do so since at that point defendants will be afforded a full opportunity to respond.

*Disposition*

The judgment is reversed with instructions to permit plaintiffs to file an amended complaint.

Wood, P. J., and Lillie, J., concurred.