[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case involves a motion to strike a claim for bystander emotional distress in a medical malpractice action brought against two separate sets of defendants — one an individual doctor, the other a medical group and three of its doctors. The underlying claim centers on severe injury suffered by a child born to the plaintiff, Judith Kyle. The parents also have brought a claim for bystander emotional distress claiming they were present in the delivery room and directly witnessed the conduct of the defendants and their child's suffering as a result of this conduct. The defendants have filed a motion to strike against the bystanders emotional distress claims.
The standards to be applied to a motion to strike are well-known. All reasonable inferences must be given to claims made in the complaint which are the object of the motion. Amodio v. Cunningham, 182 Conn. 80 (1980).
One of the grounds for this motion is that despite Clohessy v.Bachelor, 237 Conn. 31 (1996), and its recognition of this tort, such a claim cannot be made in the medical malpractice area. In Maloney v.Conroy, 208 Conn. 392 (1988), the court basically said despite what we may do with regards to bystander emotional distress claims in other contexts, such a tort is not permitted in the medical malpractice context. The Maloney court, even analyzed and rejected the implications of Ochoa v. Superior Court, 703 P.2d 1 (1985), which allowed a mother's bystander claim where she observed the lack of treatment given by medical personnel to her son who later died. In order to permit such a claim, in CT Page 4617 California the Ochoa court expanded the requirements of that state's original bystander case. Dillon v. Legg, 441 P.2d 912 (1968). Dillon had required the affected parent to observe an injury which was "the result of a brief and sudden occurrence." Ochoa said the "sudden occurrence" requirement was an unwarranted restriction on Dillon v. Legg,703 P.2d at p. 7.Maloney recognized that Ochoa's expansion of Dillon made bystander claims viable where there was a claim of medical malpractice because a course of conduct could provide the basis for such a claim. Maloney then gave policy reasons why a bystander claim should not be permitted in the malpractice setting.
But then came Clohessy which recognized the tort of bystander emotional distress. Clohessy involved a motor vehicle fatality, Maloney and medical malpractice was not at issue. The Clohessy court permitted a bystander claim in general terms if four requirements were met. The second requirement states the bystander's emotional distress must be caused by the contemporaneous sensory perception of the event or conduct causing the injury. 237 Conn., p. 52. The court relied in part on Thing v.LaChusa, 771 P.2d 814 (Cal., 1989) for this requirement which reflects a rejection of Dillon's "sudden occurrence" requirements. But Thing v.LaChusa relied on its earlier decision in Ochoa in abandoning the Dillon
limitation.
In light of Clohessy, can a bystander claim be brought in the medical malpractice context?
A directly related issue, especially in light of the public policy concerns of Maloney, is whether if such a claim were to be permitted in such a context can it be limited in such a way as to assuage the concerns of the Maloney court. Maloney reasoned that the if bystander claims were to be allowed against hospitals and medical treatment facilities, these institutions would be likely "to curtail substantially the extent of visitation of patients" . . . . and . . . "medical personal may feel obligated to respond to the usually uniformed complaints of visitors concerning the treatment of patients. . . ." 208 Conn., p. 402-03.
At the Superior Court level, there is a sharp division as to whetherClohessy, in recognizing the tort for bystander emotional distress, also rejected Maloney's suggestion that even if the tort were to be permitted, it should not be applied in the medical malpractice context.
Cases arguing the position that Maloney is still controlling despiteClohessy's broad language cite the policy reasons set forth in Maloney against allowing the tort where hospitals or other medical treatment facilities are accused of medical negligence, and the case of Mendillov. Board of Education, 246 Conn. 456 (1998), decided two years after CT Page 4618Clohessy. Mendillo did not present a bystander claim let alone such a claim in the medical malpractice area. Mendillo rejected the tort of loss of parental consortium in our state and in doing so cited Maloney as an example of where our courts have refused to impose third party liability on a tortfeasor although, as the court noted in Maloney, the patient's daughter. . . . "suffered emotional distress from observing her mother's health deteriorate from the physician's substandard care."246 Conn., p. 480; this the court said was done for "policy reasons." Id., p. 492 — presumably the ones stated in Maloney.
This court along with others have held that Clohessy permits a bystander claim in the medical malpractice context. In Estate of Davisv. Yale New Haven Hospital, 26 CLR 481 (2000), this court noted that it was aware of no case in any jurisdiction that accepted Dillon's position before Thing was adopted or who follow Dillon without alluding to Thing
that refused to apply the tort in the medical malpractice context. The court was unaware of Mendillo's mention of Maloney when it wrote Davis
but after all, on the present issue, when all is said and done theMendillo reference to Maloney is dicta, and not only dicta but dicta and a string cite in a case discussing a different tort. In any event, the law as it has developed since Dillon and after Ochoa has placed strong limitations on this tort severely limiting its viability in the medical malpractice context. In fact, the court could find very few cases applying the tort in the medical malpractice situation.
The reason this is so is evident from an examination of the language ofOchoa itself.
In rejecting the "sudden occurrence" requirement of Dillon, the court said at p. 703 P.2d, p. 8:
 "We are satisfied that when there is observation of the defendant's conduct and the child's injury and
contemporaneous awareness the defendant's conduct or lack thereof is causing harm to the child, recovery is permitted." (Emphasis by this court.)
In the specialized field of medical care, treatment and diagnosis, it is the unusual case where the layperson visitor will (1) be aware that any particular treatment or lack thereof is causing the patient injury and/or (2) even expect to be present while treatment or surgical or diagnostic procedures are being performed by medical staff which later are alleged to be the cause of injury.
The Clohessy court relied heavily on the case of Porter v. Jaffe,417 A.2d 521 (N.J., 1980) (gruesome case where child crushed by elevator CT Page 4619 in mother's presence). New Jersey recognizes the validity of a bystander claim in the medical practice area but puts limits on it. The case ofFrame v. Kothari, 560 A.2d 675 (N.J., 1989) evaluated a bystander claim in the context of medical malpractice under New Jersey law. The claim was dismissed because the alleged misdiagnosis did not manifest itself in immediate injury. The court, at pp. 680-81, said the following:
 "Although variously expressed, the common thread running through these cases is that a misdiagnosis normally does not create the kind of horrifying scene that is a prerequisite to recovery. Rarely will a member of the patient's family contemporaneously observe the immediate consequence of the defendant's misdiagnosis and even more rarely will the results of the misdiagnosis be the injury or death of a loved one contemplated by the gruesome scene portrayed in Porter.
The court went on to say that if a family member witnesses "the physician's malpractice, observes the effect of the malpractice on the patient, and immediately connects the malpractice with the injury, that may be sufficient to allow recovery for the family member's emotional distress." Id., p. 681.[1]
As Ochoa itself said recovery is permitted "when there is observation of the defendant's conduct and the child's injury and contemporaneous awareness of the defendant's conduct or lack thereof is causing harm to the child." 703 P.2d at p. 8. In Ochoa, the mother was with her child for a considerable period of time; the child "yelled and screamed complaining of excruciating pain in the chest area" . . . "the child was vomiting and unable to retain any fluids throughout the ordeal." Earlier, his skin was clammy and the child was hallucinating. The medical personnel at the juvenile facility refused to let a private doctor see the child and despite requests by the mother the doctor at the facility did not even see the child. Id., pp. 5-6.
In Mobaldi v. Regents, 55 Cal.App.3d 573, 127 Cal.Rptr. 720 (1976), the mother brought the child to a hospital for tests relating to a kidney defect. A physician gave the child an injection while he was in her arms, the wrong dose was admitted and after the doctor left the room the child began to breath peculiarly, became spastic, had convulsions and became comatose.
Both these parents were immediately and contemporaneously aware that what the doctors had done or failed to do — apart from whether they were even negligent — had caused the child harm. CT Page 4620
The case of Justus v. Atchinson, 565 P.2d 122 (Cal.Sup.Ct.) further illustrates this limitation on bystander actions in malpractice cases. There, the court said:
 . . . "each complaint paints the following picture: The plaintiff husband witnessed certain disturbing developments in the delivery room, including expressions of concern by the medical staff and use of emergency procedures. Whether the described events constitute negligence is questionable, but they no doubt induced a growing sense of anxiety on the plaintiff's part. Yet his anxiety did not ripen into the disabling shock which resulted from the death of the fetus until he was actually informed of that event by the doctor; prior to that moment, as a passive spectator he had no way of knowing that the fetus had died. In short, the impact derived not from what he saw and heard during the attempted delivery, but from what he was told after the fact. As we have seen, however, a shock caused by "learning of the accident from others after its occurrence." (68 Ca.2d at p. 741, 69 Cal.Rptr. at p. 80, 441 P.2d at p. 920) will not support a cause of action under Dillon." Id., pp. 135-36.
Assuming a bystander claim can be made in the medical malpractice context, the question must be answered whether given the allegations of this complaint a bystander claim is permissible in light of the various limitations placed on such a claim that have just been discussed.
The court will first discuss the bystander claim against Norwich Obstetric and Gynecologic Group, Drs. Soliman, Gulley and Bodin set forth in count four.
The court will make a more detailed analysis of Clohessy especially as it relates to a bystander claim in the medical malpractice context.
Clohessy sets forth four requirements to establish this tort (237 Conn. at pp. 52-54).
 1) The bystander must be closely related to the injury victim.
2) The bystander's emotional injury must be caused by the contemporaneous sensory perception of the event or CT Page 4621 conduct that causes the injury.
 3) The injury to the victim must be substantial, resulting either in death or serious physical injury.
 4) The bystander must have sustained a serious emotional injury — that is, a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances.
As to all the defendants in count four, the first and fourth criteria are met by the allegations of the complaint. The child is the daughter of the plaintiffs. The Clohessy court relied in part on Lejeune v. RayneBranch Hospital, 556 So.2d 559 (La., 1990). That court said at page 570: . . . "the direct victim of the traumatic injury must suffer such harm that it can reasonably be expected that one in the plaintiff's position would suffer serious mental anguish from the experience. In Frame v.Kothari, supra, the court noted, in a bystander claim case, that "Recovery for the negligent infliction of emotional distress is meant to cover the observation of shocking events that do not occur in the daily lives of most people." 560 A.2d at p. 678. cf Gates v. Richardson,719 P.2d 193, 199 (Wyo., 1986). Given the allegations of injury suffered by the child as a result of the alleged malpractice of the defendants, requirement 4 of Clohessy can be found to be met on the face of these pleadings.
The real problem in malpractice cases and difficulty here for the plaintiff are the second and third requirements of Clohessy.
First there must be a contemporaneous observance of the action causing injury and an awareness that this is the case, see just concluded discussion. Any other rule would, in effect, "create a potential cause of action in every parent who learned, by any reasonable means, of his or her child's negligently inflicted death or injury, and as a result suffered emotional injury manifested by physical symptoms." Nutter v.Frisbee Memorial Hospital, 474 A.2d 584, 585, 587 (NH, 1984) cf Buduariv. Barry, 222 Cal.Rptr. 446 (1986); Frame v. Kothari, 560 A.2d 675, 681
(NJ, 1989).
Secondly, the implication of all of this is that the second and third requirements must be read together. Clohessy indicated as much when it made the previously noted quotation from Lejeune v. Rayne BranchHospital, supra, and went on to say: "To a sensitive parent, witnessing a minor injury to his or her child could produce an emotional response" but "under those circumstances a cause of action for bystander emotional CT Page 4622 distress will not lie. . . . When confronted with accidental death (or serious injury) the reaction to be expected . . . is shock and fright."237 Conn. at p. 54; Court quoted from Portee v. Jaffee, 417 A.2d 521
(NJ, 1980) (emphasis by this court).
Telescoping the second and third requirement guarantees, the validity of the extreme emotional response and thus justifies the ambit of foreseeability imposed on the wrongdoer.
It is clear that no viable bystander claim lies against Drs. Gulley and Bodin. The allegations of the complaint which refer to them all refer to alleged pre-delivery diagnostic errors and failures to monitor the condition of the mother and fetus prior to the actual delivery or review sufficiently the mother's condition. These alleged acts or omissions of medical negligence were not contemporaneous with any injury suffered by the child and there can be and is no allegation even that the parents were aware that any of the alleged acts of malpractice were having an effect on the child at the time the alleged acts or omissions occurred.
The claim against Dr. Soliman presents the more difficult problem. Count four alleges that while the child was "undergoing her delivery and subsequent treatment by the defendant Soliman (the parents) were present in the Backus Hospital operating room and witnessed the entire event" (¶ 46). Paragraph 47 alleges that "as a result of watching their daughter suffer excruciating perinatal distress and the other injuries alleged herein above, and pain and suffering" the parents were caused to suffer extreme emotional distress . . ."
The problem with these allegations is that they are conclusory and go too far if their intent is to establish a bystander claim in the medical malpractice context or at the very least they are not exact enough.Schmidt's Attorneys' Dictionary of Medicine defines perinatal as: "Pertaining to, occurring in or involving the period shortly before, during and shortly after the time of birth." Many, if not most, of the injuries allegedly suffered by this child and referred to in paragraphs 37 and 38 could not have been contemporaneously observed nor are they the type of injuries the parents would have been aware of while they were in the operating room — for example, delayed development, visual impairment, liver injury, etc. If the pleadings are given their most favorable reading and perinatal is defined to refer to the distress and injuries suffered during birth and immediately thereafter, the complaint must be examined for what the child experienced in the operating room, what the parents could have observed and whether they could be said to have contemporaneously observed the immediate consequences of Dr. Soliman's actions or failures to act. cf Frame v. Kothari, supra, Lejeunev. Rayne Branch Hospital, supra. CT Page 4623
What does the complaint say in this regard? Count four incorporates the first 45 paragraphs of the first count.
 "31. At or about 6:05 PM Judith was brought to the operating room; spinal anesthesia was administered and surgery begun at or about 6:21 PM.
 32. Oligohydraminos, and the presence of heavy meconium in the amniotic fluid were confirmed as the surgery proceeded and CAMRYN KYLE was delivered at 6:27 PM covered in thick meconium. The umbilical cord pH was 6.944, her blood glucose so decreased as to be unmeasurable and her blood pressure severely depressed.
 33. Attending pediatrician Dr. DAVID L. SCHOON assisted in delivery. Camryn cried, aspirated meconium and immediately stopped breathing. No suctioning on Judith's abdomen was performed before Camryn cried and/or breathed by Dr. Soliman or Dr. DAVID L. SCHOON nor was suctioning performed below the vocal cords.
 34. Camryn was intubated after 7:15 PM and ventilated by Dr. David Cheromcha of Lawrence Memorial Hospital who was at Backus Hospital.
 35. Camryn was assessed at Backus by defendant DAVID L. SCHOON and thereafter by Dr. CHEROMCHA of Lawrence Memorial Hospital, and stabilized for transport from Backus Hospital to Boston Children's Hospital, by the Lawrence Memorial transport team, critically ill with perinatal depression, myocardial dysfunction, liver dysfunction, pulmonary hypertension, hypoglycemia and on life support; she was thereafter treated and subsequently transferred to the University of Connecticut Medical Center on February 21, 1999."[2]
The problem with these allegations is that there is nothing about them that indicates from anything that happened in the operating room that the parents would have been aware that the events occurring therein were causing the child serious injury. The closest these allegations come to making such a claim is that the child at one point stopped breathing and was intubated and ventilated. But that standing alone would not indicate the child thereby suffered serious, permanent injury. CT Page 4624
Perhaps even more to the point the allegations do not support a conclusion that the parents were contemporaneously aware that the actions or failures to act of the doctor was causing the child serious injury. See Frame v. Kothari, supra, Mobaldi v. Regents, supra. In fact, the situation here is more analogous to that in another California caseJustus v. Atchison, supra, previously quoted from by the court were the results of the doctor's alleged malpractice was made apparent to the parents after injury was caused.
In any event, the allegations of count four as presently framed do not support a claim for bystander emotional distress even if such a claim were to be held cognizable in our state.
The bystander claim in count six must also be stricken. The factual allegation to support this claim are set forth in paragraphs 31 through 35, likewise incorporated from the first count and also part of count four. They have previously been quoted by the court. If anything, these allegations against Dr. Cheromacha are less supportive of the claim being made than the factual allegations made in those paragraphs against Dr. Soliman. Paragraph 34 merely states the doctor intubated and ventilated the child and then stabilized her for transport to another hospital. The general allegations of negligence asserted in the malpractice count against this doctor (count 3) at paragraph 36, like those asserted against Dr. Soliman do not independently provide a factual basis to conclude the parents were contemporaneously aware, while in the operating room, that any alleged acts or failures to act were the actual cause of severe injury to the child.
If mere repetition of malpractice allegations in a bystander count could support a bystander claim where parents were allowed to be present during a medical procedure then there would be no practical limit on this type of claim and there would be a strong incentive for doctors or treatment facilities to curtail visiting or take unnecessary medical steps to satisfy parental fears. Something more is required as set forth in Ochoa itself or Mobaldi or alluded to in Frame — contemporaneous observance of actual injury and awareness that the actions or failures to act by the doctor causes that injury. If such is the rule bystander claims in this area will be limited severely but viable in truly egregious cases.
If a bystander claim were to be permitted in the medical malpractice context after Clohessy and despite Maloney at the very least, a trial judge must address the concerns raised in Maloney. The limitations put on such a claim by New Jersey courts especially and this court does much to defuse the specter raised in Maloney. CT Page 4625
The court, therefore, strikes counts four and six.
Corradino, J.