[No. S095474. Aug. 12, 2002.]

JANICE BIRD et al., Plaintiffs and Appellants, v.
ROLANDO SAENZ et al., Defendants and Respondents.

**COUNSEL**

Steven G. Cohn for Plaintiffs and Appellants.

Schmid & Voiles, Susan H. Schmid, Suzanne De Rosa; Thelen Reid & Priest, Curtis A. Cole and Kenneth R. Pedroza for Defendants and Respondents Rolando Saenz and David M. Fung.

Bonne, Bridges, Mueller, O'Keefe & Nichols, David J. O'Keefe, Patricia Egan Daehnke, Michael A. Gregg, Mark B. Connely and Vangi J. Johnson for Defendant and Respondent Scott M. Eisenkop.

Horvitz & Levy, H. Thomas Watson and David S. Ettinger for California Medical Association, California Dental Association and California Healthcare Association as Amici Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—We granted review to consider whether plaintiffs have viable claims as bystanders for negligent infliction of emotional distress arising out of alleged medical malpractice directed to their close relative. We conclude they do not.

### I.   FACTS AND PROCEDURAL BACKGROUND

This is an action for wrongful death and negligent infliction of emotional distress (NIED) based on medical malpractice. Plaintiffs are the adult daughters of decedent Nita Bird. Nita succumbed to cancer on January 15, 1996. Defendants are the physicians who treated Nita. The superior court granted summary judgment for defendants on both claims, but the Court of Appeal reversed. In granting review, we limited briefing and argument to the question "whether defendants' motion for summary judgment was properly granted on plaintiffs' claim for negligent infliction of emotional distress."

The very general allegations of plaintiffs' complaint do not identify the specific acts underlying their claim for NIED. However, the evidence and arguments submitted in connection with the motion for summary judgment reveal that plaintiffs base the claim on the events of November 30, 1994.

On that date, plaintiff Janice Bird brought her mother Nita to the hospital to undergo an outpatient surgical procedure. The goal of the procedure was to insert a Port-A-Cath—a venous catheter surgically implanted to facilitate the delivery of chemotherapeutic agents. Nita was undergoing chemotherapy because she had six weeks earlier been diagnosed with metastatic ovarian cancer involving many of her internal organs and lymph nodes. Nita was taken into the operating room about 1:45 or 2:00 p.m. Janice expected the procedure to take about 20 minutes. After an hour had elapsed, Janice asked

a hospital volunteer to see why the procedure was taking so long. Over the loudspeaker system, Janice heard the announcement, "[t]horacic surgeon needed in surgery, stat." Janice assumed the call related to Nita because she believed all other surgeries had been completed. An hour to an hour and a half later, defendant Dr. Scott M. Eisenkop came to the waiting room to report to Janice. Janice remembers him saying "that they had more trouble inserting the Port-A-Cath than they had anticipated, that when they went to insert it, they thought that they got a bubble in her vein, and they think that she might have had a mild stroke." Janice telephoned her sister, plaintiff Dayle Edgmon, with this news and returned to the waiting room. About 4:30 p.m., someone told Janice that Nita was "sleeping right now" and "should be going up to the fifth floor in about an hour."

Soon thereafter, Janice saw Nita "being rushed down the hallway to the CC—I presume she was going to the CCU [critical care unit]. She was bright blue. The angle of the bed was like this (indicating). Her feet were way up in the air, her head was almost touching the ground, there was all these doctors and nurses around there and they're running down the hallway, down to that end of the hospital . . . ." The medical personnel rushed Nita into a room and closed the door behind them. Janice, who was in the hallway, asked Dr. Dowds what was happening. Dr. Dowds went to check and returned with this news: "From what I can see," Janice remembers him saying, "I think they nicked an artery or a vein, and it looks like all the blood went into her chest. They're going to have to insert a drainage tube into her chest to drain out the fluid, and they're pumping—they're trying to pump as much fluids and blood into her to keep her alive until the vascular surgeon gets there." Ten or 15 minutes later, Janice saw Dr. Dowds running down the hall with multiple units of blood.

At this point Dayle arrived. Janice told her briefly what was happening. Dr. Dowds then told Dayle what he had already told Janice, namely, that an artery or vein had been nicked and that major surgery would be necessary. Shortly thereafter, Janice and Dayle saw Nita being rushed down the hallway to surgery. In Dayle's words, "All of a sudden I saw, I would say, approximately at least 10 doctors and nurses running down the hall with my mother and I remember her head was towards the floor, her feet were up in the air and she was blue." Janice's description is essentially identical, with the addition that she understood her mother's angle as intended "to keep the blood moving to the heart."

Those are the events on which plaintiffs base their claim for NIED. Soon thereafter, emergency surgery stopped Nita's internal bleeding. But plaintiffs do not claim that this subsequent procedure caused them to suffer actionable

emotional distress. Nita was discharged from the hospital 33 days later, on January 2, 1995, and resumed chemotherapy the next month.

In pleading their NIED claim, plaintiffs allege they "were all present at the scene of the injury-producing events at issue herein at the time when they occurred" and that they "were all aware that Defendants, and each of them, were causing injury to their mother, Nita Bird." Defendants moved for summary judgment on the ground that the undisputed evidence showed plaintiffs had not been present in the operating room at the time Nita's artery was transected, had not observed the transection, and had learned about it from others only after it had occurred. Plaintiff Kim Moran, moreover, had been out of the state. In support of their motion, defendants cited *Thing v. La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], in which we held "that a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if," the plaintiff satisfies three requirements, including the requirement that the plaintiff be "present at the scene of the injury-producing event at the time it occurs and [be] then aware that it is causing injury to the victim." (*Id.* at pp. 667-668.)

In their opposition to the motion for summary judgment, plaintiffs admitted they had not been present in the operating room when Nita's artery was transected. Plaintiffs disagreed, however, with defendants' definition of the relevant injury-producing event as limited to the transection of Nita's artery. In plaintiffs' view, the event also included defendants' failure immediately to diagnose and treat the damaged artery. To raise a triable issue of fact on the issue, plaintiffs submitted the deposition testimony summarized above. Plaintiffs Janice Bird and Dayle Edgmon also submitted declarations stating, in identical words, that, at the time Dayle arrived at the hospital, "[b]oth of us knew that our mother was severely injured and that the injury was continuing," and that, at the time Nita was rolled through the hallway to surgery, both "were aware that our mother was bleeding to death as we watched."

The superior court, as already noted, granted defendants' motion for summary judgment. The Court of Appeal reversed. "To the extent that the injury-producing event includes the alleged negligent care and treatment of [Nita] outside the operating room," the court reasoned, "it remains a triable issue of fact as to whether appellants meet the test under *Thing*." We granted review.

## II.  DISCUSSION

This case requires us to consider once again the circumstances under which bystanders to an event injuring a third party may sue the allegedly

negligent actor for emotional distress. In *Amaya v. Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295 [29 Cal.Rptr. 33, 379 P.2d 513], we declined to recognize such claims, foreseeing if we did a "fantastic realm of infinite liability." (*Id.* at p. 315.) Five years later, in *Dillon v. Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316] (*Dillon*), we reversed course. Equating the duty to avoid causing emotional harm to bystanders with the foreseeability they might suffer such harm, we articulated a set of nonexclusive guidelines for assessing foreseeability, and thus duty, on a case-by-case basis.[1] Over the ensuing two decades we, and the lower courts, attempted to apply those guidelines. Looking at that effort in retrospect, however, in *Thing v. La Chusa, supra,* 48 Cal.3d 644 (*Thing*), we discerned that *Dillon* had produced arbitrary and conflicting results and "ever widening circles of liability." (*Thing, supra,* at pp. 653, 662.) Recognizing this, we did not reverse course yet again, but we did make an important course correction. ■ In place of *Dillon*'s nonexclusive guidelines, we set out three mandatory requirements that claims for NIED must satisfy to be accepted as valid. Specifically, we held "that a plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, *but only if,* said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Thing, supra,* at pp. 667-668, fns. omitted, italics added.) We emphasized the mandatory, exclusive nature of the new requirements by expressly rejecting the suggestion that liability for NIED should be determined under the more general approach set out in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496], for identifying duties of care. (See *Thing, supra,* at p. 668, fn. 11.)

Applying these requirements to the facts before us in *Thing, supra,* 48 Cal.3d 644, we held that the plaintiff as a matter of law could not state a claim for NIED. The plaintiff mother had been nearby when the defendant's automobile struck and injured her minor child, but the plaintiff had not seen

---

[1]The court in *Dillon, supra,* 68 Cal.2d 728, 740-741, wrote: "In determining . . . whether defendant should reasonably foresee the injury to plaintiff, or, in other terminology, whether defendant owes plaintiff a duty of due care, the courts will take into account such factors as the following: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship."

or heard the accident; instead, she became aware of it only when someone told her it had occurred and she rushed to the scene and saw her child lying injured and unconscious on the road. Under these facts, the plaintiff could not satisfy the requirement of having been present at the scene of the injury-producing event at the time it occurred and of having then been aware that it was causing injury to the victim. We reinforced our conclusion by disapproving the suggestion in prior cases that a negligent actor is liable to all those persons "who may have suffered emotional distress on viewing or learning about the injurious *consequences* of his conduct" rather than on viewing the injury-producing *event*, itself. (*Id.* at p. 668, italics added, disapproving *Nazaroff v. Superior Court* (1978) 80 Cal.App.3d 553 [145 Cal.Rptr. 657], and *Archibald v. Braverman* (1969) 275 Cal.App.2d 253 [79 Cal.Rptr. 723], to the extent inconsistent with *Thing*.)[2]

█ Here, only the second *Thing* requirement is at issue. Defendants argue that plaintiffs, who admittedly did not perceive the transection of their mother's artery, were not present at the scene of the injury-producing event at the time it occurred and were not then aware that it was causing injury to the victim.

Certainly defendants are correct that plaintiffs cannot prevail on a claim for NIED based solely on the transection of Nita's artery. The undisputed facts establish that no plaintiff was present in the operating room at the time that event occurred. Indeed, plaintiffs assert that even the defendant physicians, who were present and actively involved in Nita's care, failed to diagnose the transection for some time. Plaintiffs first learned an accident had taken place when they heard that news from a physician and saw some of the injurious consequences. The earlier call for a thoracic surgeon over the hospital's loudspeaker system may seem full of portent in retrospect, but it carried no clear information to a bystander in a waiting room about the progress of a particular surgical procedure. █ To be sure, *Thing's* requirement that the plaintiff be contemporaneously *aware* of the injury-producing event has not been interpreted as requiring visual perception of an impact on the victim. A plaintiff may recover based on an event perceived by other senses so long as the event is contemporaneously understood as causing injury to a close relative. (*Wilks v. Hom* (1992) 2 Cal.App.4th 1264,

---

[2] In both *Nazaroff v. Superior Court, supra,* 80 Cal.App.3d 553, and *Archibald v. Braverman, supra,* 275 Cal.App.2d 253, courts had permitted NIED claims by plaintiffs who had seen the immediate aftereffects of injury-producing events, but not the events themselves. The plaintiff in *Nazaroff,* upon hearing a neighbor scream her child's name, realized he must have fallen into a pool and immediately ran "perhaps thirty feet" to see the child being pulled from the water and given mouth-to-mouth resuscitation. (80 Cal.App.3d at p. 559.) Similarly, the plaintiff in *Archibald* had "viewed [her] child's injuries within moments" after gunpowder exploded in his hand. (275 Cal.App.2d at p. 255.)

1272-1273 [3 Cal.Rptr.2d 803] [plaintiff was in the living room speaking to her children in their bedrooms when she saw, heard and felt one bedroom explode from a gas leak].)[3] ▮ But this slight degree of flexibility in the second *Thing* requirement does not aid plaintiffs here because they had no sensory perception whatsoever of the transection at the time it occurred. Thus, defining the injury-producing event as the transection, plaintiffs' claim falls squarely within the category of cases the second *Thing* requirement was intended to bar.

Conceding the point at least implicitly, plaintiffs seek to redefine the injury-producing event to include something of which they were contemporaneously aware. In their own words, "[w]hile Plaintiffs do not dispute that Janice Bird and Dayle Edgmon were not in the operating room at the time Nita Bird's artery was transected, Plaintiffs do contend that Janice Bird and Dayle Edgmon were aware that Nita Bird's artery and/or vein had been injured as a result of Defendants' conduct, that Defendants failed to diagnose that injury and that Defendants failed to treat that injury while it was occurring."

The problem with defining the injury-producing event as defendants' failure to diagnose and treat the damaged artery is that plaintiffs could not meaningfully have perceived any such failure. Except in the most obvious cases, a misdiagnosis is beyond the awareness of lay bystanders. Here, what plaintiffs actually saw and heard was a call for a thoracic surgeon, a report of Nita suffering a possible stroke, Nita in distress being rushed by numerous medical personnel to another room, a report of Nita possibly having suffered a nicked artery or vein, a physician carrying units of blood and, finally, Nita still in distress being rushed to surgery. Even if plaintiffs believed, as they stated in their declarations, that their mother was bleeding to death, they had no reason to know that the care she was receiving to diagnose and correct the cause of the problem was inadequate. While they eventually became aware that one injury-producing event—the transected artery—had occurred, they had no basis for believing that another, subtler event was occurring in its wake.

In other NIED cases decided after *Thing, supra,* 48 Cal.3d 644, and based on alleged medical negligence, courts have not found a layperson's observation of medical procedures to satisfy the requirement of contemporary

---

[3]On the other hand, someone who hears an accident but does not then know it is causing injury to a relative does not have a viable claim for NIED, even if the missing knowledge is acquired moments later. (E.g., *Fife v. Astenius* (1991) 232 Cal.App.3d 1090 [284 Cal.Rptr. 16] [finding no viable claim for NIED when the parents and brothers of an accident victim heard a crash, saw debris fly above the wall separating their yard from the street, and ran outside to find their injured relative still inside the damaged vehicle].)

awareness of the injury-producing event. This is not to say that a layperson can never perceive medical negligence, or that one who does perceive it cannot assert a valid claim for NIED. To suggest an extreme example, a layperson who watched as a relative's sound limb was amputated by mistake might well have a valid claim for NIED against the surgeon. Such an accident, and its injury-causing effects, would not lie beyond the plaintiff's understanding awareness. But the same cannot be assumed of medical malpractice generally.

The leading case on point is *Golstein v. Superior Court* (1990) 223 Cal.App.3d 1415 [273 Cal.Rptr. 270] (*Golstein*). There, the parents of a child with curable cancer watched as he underwent radiation therapy. That the child had been lethally overexposed was not discovered until later, when he developed symptoms of radiation poisoning. While the plaintiffs had observed the procedure that was later determined to have been an injury-producing event, they were not then aware the treatment was causing injury. Addressing the second requirement of *Thing, supra,* 48 Cal.3d 644, 668, the plaintiffs argued "that since radiation is invisible its fatal dosage cannot be seen, and it is unjust to deny them recovery based on rules having their origins in fact patterns involving visible events such as accidents. Were it not for *Thing,*" the *Golstein* court reasoned, the plaintiffs "would have a compelling case. However, we interpret *Thing*'s policy statement as a requirement that [NIED] plaintiffs experience a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury. As the Supreme Court stated the rule in *Thing,* the plaintiff must be 'present at the scene of the injury-producing event at the time it occurs and . . . then aware that it is causing injury to the victim . . . .'" (*Golstein, supra,* at pp. 1427-1428, fns. omitted, quoting *Thing, supra,* at p. 668.)

In a footnote, the court in *Golstein, supra,* 223 Cal.App.3d 1415, observed that it had "repeatedly asked [plaintiffs'] counsel at oral argument to present some analytical distinction between [the] case [of radiation overexposure] and the standard medical malpractice case, where the injury is typically witnessed by the plaintiff but the plaintiff does not see, or meaningfully comprehend, the actual injury-causing event. Counsel was unable to do so. We are reasonably certain the Supreme Court would not accept a conclusion which could apply [NIED] recovery almost automatically to a medical malpractice plaintiff who observes only the suffering of the victim and not the actual event that causes that suffering." (*Id.* at p. 1427, fn. 3.)

The courts in other cases decided after *Thing, supra,* 48 Cal.3d 644, have reached similar conclusions. In *Wright v. City of Los Angeles* (1990) 219

Cal.App.3d 318 [268 Cal.Rptr. 309], a relative who watched a paramedic conduct a cursory medical examination that failed to detect signs of sickle cell shock was permitted to sue for wrongful death but not for NIED. While the relative was "present at the scene at the time the injury-producing event occurred," there was no evidence "he was *then* aware [that the decedent] was being injured by [the paramedic's] negligent conduct." (*Id.* at p. 350.) Likewise, in *Breazeal v. Henry Mayo Newhall Memorial Hospital* (1991) 234 Cal.App.3d 1329 [286 Cal.Rptr. 207], a plaintiff who observed ultimately unsuccessful efforts to restore her son's breathing with a tracheostomy and endotracheal tubes was held not to have a valid claim for NIED.[4] "There was evidence that at some point [the plaintiff] saw [one of the defendant physicians] bent over [her son], with blood on both of them. However, there was no evidence . . . that what [the physician] was doing at that moment was 'an injury-producing event,' rather than an unsuccessful attempt to correct an already existing injury . . . ." (*Id.* at p. 1342.) Nor was she "contemporaneously . . . aware that any such event was causing him injury." (*Ibid.*) Finally, in *Meighan v. Shore* (1995) 34 Cal.App.4th 1025 [40 Cal.Rptr.2d 744], the plaintiff wife, who was trained as a nurse, feared that her husband was experiencing a heart attack and believed that he was not being treated appropriately in the emergency room. In fact he was suffering a heart attack, but initial test results were to the contrary and physicians incorrectly misdiagnosed his condition. Citing *Golstein, supra,* 223 Cal.App.3d 1415, 1427, the court concluded the plaintiff had no viable claim for NIED because "understanding perception of the injury-causing event is essential, and if it cannot be perceived, recovery cannot be allowed." (*Meighan v. Shore, supra,* at p. 1046.)

Plaintiffs in the case before us rely almost entirely on *Ochoa v. Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1] (*Ochoa*), a case predating *Thing, supra,* 48 Cal.3d 644. But *Ochoa* does not support their position. In that case, a boy confined in a juvenile detention facility died of pneumonia after authorities ignored his obviously serious symptoms, which included vomiting, coughing up blood, and excruciating pain. We permitted the mother, who observed the neglect and recognized it as harming her son, to sue as a bystander for NIED. Anticipating the formula we would later adopt in *Thing,* we explained that "when there is observation of the defendant's conduct and the child's injury *and contemporaneous awareness the defendant's conduct or lack thereof is causing harm* to the child, recovery is permitted." (*Ochoa, supra,* at p. 170, italics added.) The injury-producing event was the failure of custodial authorities to respond significantly to

---

[4]The court also held the claim barred under the Good Samaritan statutes (Bus. & Prof. Code, §§ 2395, 2396). (*Breazeal v. Henry Mayo Newhall Memorial Hospital, supra,* 234 Cal.App.3d 1329, 1338-1341.)

symptoms obviously requiring immediate medical attention. Such a failure to provide medical assistance, as opposed to a misdiagnosis, unsuccessful treatment, or treatment that turns out to have been inappropriate only in retrospect, is not necessarily hidden from the understanding awareness of a layperson.

Even before *Thing, supra*, 48 Cal.3d 644, decisions applying the looser guidelines of *Dillon, supra*, 68 Cal.2d 728, denied recovery to bystanders for emotional distress suffered while observing medical procedures. (See *Justus v. Atchison* (1977) 19 Cal.3d 564, 584-585 [139 Cal.Rptr. 97, 565 P.2d 122] [fathers of stillborn children, who had been present in the delivery rooms and observed the obstetrical procedures, could not recover for NIED because they were not aware until told by physicians that their children had not survived]; *Jansen v. Children's Hospital Medical Center* (1973) 31 Cal.App.3d 22 [106 Cal.Rptr. 883] [mother watched her child sicken and die in the hospital of an undiagnosed ulcer].)[5]

On this point, a single decision to the contrary can be found predating our decision in *Thing, supra*, 48 Cal.3d 644, but it cannot be reconciled with *Thing*. The plaintiff in *Mobaldi v. Regents of University of California* (1976) 55 Cal.App.3d 573 [127 Cal.Rptr. 720] (*Mobaldi*), sued for NIED after her child was seriously injured by an incorrectly prepared intravenous solution. The mother held her child as the solution was administered and watched as he suffered convulsions and lapsed into a coma. The court concluded that, "[s]o long as the plaintiff's observation of the results of the defendant's infliction of harm upon another is direct and contemporaneous, there is no significance in the plaintiff's lack of awareness that the defendant's conduct inflicting the injury is negligent. To reason otherwise would deny the protection of *Dillon*[, *supra*, 68 Cal.2d 728,] to a mother observing a child killed by a driver, whose only negligence is his intoxication, simply because the mother can not be aware of the fact of drunkenness until after the accident." (*Id.* at p. 583.)

The court in *Mobaldi, supra*, 55 Cal.App.3d 573, may well have been correct in saying that a plaintiff need not contemporaneously understand the defendant's conduct as *negligent*, as opposed to *harmful*. But the court confused awareness of negligence, a legal conclusion, with contemporaneous, understanding awareness of the event as causing harm to the victim. To borrow the *Mobaldi* court's own example, the bystander to the fatal traffic

---

[5]In *Ochoa, supra*, 39 Cal.3d 159, 168, we disapproved both *Justus v. Atchison, supra*, 19 Cal.3d 564, and *Jansen v. Children's Hospital Medical Center, supra*, 31 Cal.App.3d 22, to the extent those cases suggested that liability under the guidelines of *Dillon, supra*, 68 Cal.2d 728, was limited to cases involving a "sudden occurrence."

accident knows the driver's conduct has killed the child, even though she may not know the driver was drunk. One takes a giant leap beyond that point, however, by imposing liability for NIED based on nothing more than a bystander's "observation of *the results* of the defendant's infliction of harm," however "direct and contemporaneous." (*Id.* at p. 583, italics added.) Such a rule would eviscerate the requirement of *Thing, supra,* 48 Cal.3d 644, 668, that the plaintiff must be contemporaneously aware of the connection between the injury-producing event and the victim's injuries. The Court of Appeal in *Golstein, supra,* 223 Cal.App.3d 1415, which saw this point clearly, correctly determined that *Mobaldi* did not survive *Thing.* "The actual negligent act [in *Mobaldi*]," the court in *Golstein* explained, "was not simply the injection itself, but the use of the wrong solution, an act which plaintiff, as a medical layperson, could not meaningfully perceive: what appeared to her as an innocent-seeming injection was actually the conduit of medical negligence and the cause of her child's injuries. Unlike an explosion, traffic accident, or electrocution, the injury-causing event in *Mobaldi* was essentially invisible to the plaintiff and not a component of her emotional trauma." (*Golstein, supra,* at p. 1423.)

The Court of Appeal in the case before us rejected that reasoning. "We do not believe," the court wrote, "that the bystander theory of recovery requires the plaintiff to have more medical acumen than the defendant doctor so as to be able to 'perceive' and understand that a misdiagnosis is being made; rather, all that *Thing* requires is that the plaintiff be present at the scene of the victim's treatment and be aware that the *course of treatment* is causing injury to the victim." (Italics added.) The Court of Appeal did not explain how a bystander without medical acumen, except in the most extreme case (see *ante,* at pp. 917-918), could meaningfully be aware that a course of treatment is causing injury. In any event, a rule permitting bystanders to sue for NIED on account of unperceived medical errors hidden in a course of treatment cannot be reconciled with *Thing*'s requirement that the plaintiff be aware of the connection between the injury-producing event and the injury. The Court of Appeal's rule would, moreover, impose nearly strict liability on health care providers for NIED to bystanders who observe emotionally stressful procedures that turn out in retrospect to have involved negligence. We may reject such a rule as inconsistent with *Thing* even without accepting defendants' more radical suggestion that as a matter of policy we categorically bar bystanders' NIED claims based on medical malpractice.

In summary, plaintiffs have not shown they were aware of the transection of Nita's artery at the time it occurred. Nor have they shown they were contemporaneously aware of any error in the subsequent diagnosis and treatment of that injury in the moments they saw their mother rolled through

the hall by medical personnel. In view of these undisputed facts, plaintiffs cannot show they were "present at the scene of the injury-producing event at the time it occur[ed] and [were] then aware that it [was] causing injury to the victim." (*Thing, supra*, 48 Cal.3d 644, 668.) Accordingly, the superior court properly granted defendants' motion for summary judgment on plaintiffs' claim for NIED.

## III. DISPOSITION

The decision of the Court of Appeal is reversed in part and remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Brown, J., Moreno, J., and Parrilli, J.,* concurred.

---

*Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.